## LEONARD et al. v. NATIONAL LABOR RELATIONS BOARD.

### No. 12974.

United States Court of Appeals
Ninth Circuit.

May 29, 1952.

St. Sure & Moore, Oakland, Cal. (George O. Bahrs, San Francisco, Cal., of counsel), for petitioners.

Carroll, Davis & Freidenrich, San Francisco, Cal., for Master Furniture Guild Local No. 1285, amici curiae.

Robert Littler, Wm. A. Ingram (of Littler, Coakley, Lauritzen, & Ferdon), San Francisco, Cal., for California Metal Trades Ass'n, Bakery Employers Ass'n of San Francisco, Food Employers Council, Inc., Truck Owners Ass'n of California, District of Columbia Trucking Ass'n, Motor Carriers' Council, Inc., Carriers Council of New Hampshire, Inc., Motor Carriers' Council, Inc., amici curiae.

Arthur C. Rooney, Chicago, Ill., Eli E. Dorsey, Seattle, Wash., Patterson, Belknap & Webb, Chauncey Belknap, Christopher W. Hoey, New York City, for Chicago

436

Bakery Employers Labor Council and Seattle Department Stores Ass'n, Inc., amici curiae.

Robert N. Denham, Washington, D. C., for Tanners Ass'n of Fulton County, Inc., Boton Bakery Employers Labor Council and Employing Bakers Ass'n of Washington, D. C., amici curiae.

S. G. Lippman, Chicago, Ill., for Retail Clerk International Ass'n, AFL and Distillery, Rectifying and Wine Workers International Union of America, AFL, amici curiae.

George J. Bott, General Counsel, National Labor Relations Board, David P. Findling, Associate General Counsel, A. Norman Somers, Asst. General Counsel, Harvey B. Diamond, Attorney, National Labor Relations Board, Washington, D. C., for respondent National Labor Relations Board.

Before DENMAN, Chief Judge, and STEPHENS and ORR, Circuit Judges.

DENMAN, Chief Judge.

Eleven furniture-dealing firms organized in a multi-employer unit organization,[1] hereafter called the Dealers, petition to set aside orders of the respondent Board to cease and desist from locking out temporarily their employees, all of them members of a single labor organization, Master Furniture Guild Local 1225, hereafter called the Union, and to give back pay to the union members so locked out. The Board petitions for the enforcement of its orders.

The Board sustained the Trial Examiner's findings that the temporary lockout occurred while the Dealers' unit and the Union were engaged in active negotiation for an amendment of a prior agreement between them as to wages and conditions of employment. It is clear that the temporary lockout was not a discharge but that the locked out men continued as the Dealers' employees.

While the negotiations were pending, the Union, by a vote of the employees of all the firms of the Dealers' unit, had called a strike, which followed, of the employees of one of the members of the Dealers, the Union Furniture Company. The latter company at the time the strike was called was complying with all the provisions of the then existing agreement. The finding is that the sole motive of the Dealers in temporarily locking out all the Union's members was as a mere reprisal for the Union's causing the strike of the Union Furniture Company's employees. The specific finding is:

"* * * Regardless of how the strike may be viewed, the fact remains, as found by the Trial Examiner, that the Respondents laid off their employees because of protected concerted activity sponsored by the Union as their statutory bargaining representative and engaged in by union members of the same bargaining unit. The layoffs thus served notice on all members of the bargaining unit, the laid-off employees as well as the strikers and non-strikers, that resort to lawful protected concerted activity by the employees of any employer-member of the bargaining unit would subject other employee-members of the bargaining unit to the reprisal of a temporary loss of employment * * *."

Upon this finding the board held that the Dealers had violated sections 8(a) (1) and 8(a) (3) of the Labor Management Relations Act, 29 U.S.C.A. § 158(a) (1, 3).

[1] The Dealers contend this finding is error and that their motivation in temporarily locking out all the employees was for no other purpose than to offset the bargaining power of the Union with which they were then negotiating. The Dealers had made this same contention before the Board which declined to pass upon it, confining the grounds of its order to the finding that the lockout was a mere reprisal for the strike against one of the Dealers' members. The issue whether the evidence sustained the finding is to be considered by us under the

1. The Board's jurisdiction rested on the unit's total interstate commerce. There is no evidence that any individual dealer engaged in such commerce in a volume giving the Board jurisdiction over him.

rule of review laid down by Section 10(e) of the Act, 29 U.S.C.A. § 160(e), as follows:

"The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive."

We think that, on such a review of the evidence as a whole, the finding of the Board that the lockout was a mere reprisal against the Union Furniture Company strikers and the other employees aiding the strikers is not sustained. We are surprised to discover that nowhere does the Board in its findings mention the evidence that the order of the Union to strike gave power to the Union's strike managers to strike successively against each one of the several dealers. This would be most likely to transfer customers of the struck firm to other members of the Dealers with a possible loss of customers and a depreciation of the Dealer's property in his good will. By repeating this on successive Dealers, a process called "whipsawing," the Dealers' unit power of collective bargaining would be impaired and ultimately the organization itself destroyed.

Taken in connection with this overlooked testimony, the evidence upon which the Board relies does not support its contention that the lockout was a mere reprisal to defeat the strike against the individual member of the Employers. This testimony is what was given by the witness St. Sure who represented the Employers' group in which he stated:

"* * * I specifically asked the employers group whether or not, in the event that only one of the employers were struck whether others would take the action which seemed to me to be in order, that is, either to support the struck store by remaining open and endeavoring to subsidize, or by closing down in support of the struck store on the theory that a strike against one was a strike against all, whichever process might be followed.

* * * * * *

"I then advised the remaining group that in the event that there was to be a strike, that is the eleven that are on the [201] list of Respondents, plus Union Furniture Company, that should they elect to regard a strike against one as a strike against all, and in the event that they should close their stores upon one of them being struck, they should inform the employees that they were regarded as being on strike; they should not sever their employment, they should continue them on the payroll as strikers and be prepared to receive them back in employment if and when the strike was settled, with protection with regards to seniority and other benefits. * * *

* * * * * *

"* * * employers, in connection with a strike situation of that kind, endeavor to elect what they think is the best strategy to come off with the result from their own point of view * * *."

This testimony should be read with the understanding that the Board rejected the Dealers' contention that the lockout here was an economic weapon to force the Union to accept the master contract proposed by the Employers' group.

Other record evidence germane to the purpose of the lockout is the following:

[By St. Sure, the employers' representative]

"* * * I was advised by a representative of the Jackson & Son Company, Griffin-Cummins, Kay Furniture, R. Knight, Lynn & Pynch, Frank Newman Company, Provident Furniture, Richmond Furniture, and the Zais Furniture Company, that if the situation developed into a strike, whether against the group or against one of the group, they would not resist the Union's demand but would sign."

[By Sparlin, the Union's representative]

"* * * He [St. Sure of the Dealers] said that they would reiterate their offer on a 5 cents an hour increase and that was all he had to offer. If that

wasn't accepted by June 1st of 1949 they would withdraw the offer * * ."

[By Sparlin]

" * * * Well, we informed them that if that was their position and they wouldn't change their position any way, there was likely to be a strike in the industry or at least in this one store. We told them there would probably be a strike in the Union Furniture Company."

"Q. But you specifically asked your membership for authority to leave in the hands of the executive board or the negotiating committee the right to determine whether there should be a strike against all the stores or one, and that one could be Union or it could be some other company; is that correct? A. Could have been.

"Q. And you asked that authority for strategic reasons, in order to try to accomplish your purpose of securing the master contract, is that correct? A. Well, that is right."

Since we have held that the finding of the Board is not sustained by the evidence, the question arises whether we should determine if the Board's order may be sustained on the ground that it is illegal for the Dealers to use the temporary lockout as counter-economic power to that of the strike in a dispute between employer and employee involving wages and labor conditions.

It is apparent from the declaration of purpose and the terms of the National Labor Relations Act of 1935, 29 U.S.C.A. § 151 et seq., that Congress was then concerned solely with enhancing the power of employees in collective bargaining with their employers for the amount of their wages and their working conditions. It became apparent in the twelve years between 1935 and the enactment of the Taft-Hartley Amendment in 1947 that the earlier act had enormously increased the power of labor unions. This was shown in the great number of successful strikes and successful negotiations for increased wages and diminishing of the hours of labor under pressure of threatened strikes in that period. Concerning this the report of the House Committee recommending the Taft-Hartley bill states:

"During the 6 years preceding the enactment of the National Industrial Recovery Act of 1933 [48 Stat. 195], the United States had an average of 753 strikes a year, involving an average of 297,000 workers; during the next 6 years 2,541 strikes per year involving an average of 1,181,000 workers; and during the next 5 years—that is through 1944—3,514 strikes a year involving an average of 1,508,000 workers.

"In 1945 approximately 38,000,000 man-days of labor were lost as a result of strikes. And that total was trebled in 1946, when there were 116,000,000 man-days lost and the number of strikes hit a new high of 4,985. The resulting loss in national wealth is staggering.

"The above figures do not take into account the man-days lost as a result of the indirect effects of these strikes."

It is strongly arguable that Congress in enacting the Taft-Hartley Act regarded the constant rise in wages between the two Acts as causatively related to the simultaneous constant rise in prices paid by the public and the constant depreciation in the value of the public's dollar.

The legislative history of the Act also shows that the twelve-year effect of the enhancement of union power had created huge unions covering vast areas, many industry wide, producing goods purchased by the public. Congress, in permitting small employers to strengthen their positions by joining multi-employer associations, undoubtedly had in mind the power of large unions to coerce these less financially able small employers.

Indicative of the changed attitude of Congress we find that the Taft-Hartley Act amended the declared purposes of Congress by stating for the first time the harm to the public from wrongful labor practices.

of the employees.[2]  In consonance with its purpose to protect the public from the enhancement of the price of goods to it and the weaker small employer against the great union, Congress, in the Haft-Hartley Act, makes the first mention of the lockout by the employer as his implement in collective bargaining.

The term "to bargain collectively" is defined in Section 8(d)[3] of the Taft-Hartley Act which sets forth certain steps which must be taken by a party to a collective bargaining contract in order to modify or terminate the contract.  These steps are as follows:

The party desiring to terminate or modify such contract must:

1.  Serve written notice on the other party of the proposed termination or modification 60 days prior thereto.

2.  Offer to meet and bargain with the other party.

3.  Notify the Federal Mediation and Conciliation Service within thirty days; and

4.  "Continues in full force and effect, without resorting to *strike or lock-out* all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later."

The House Conference Report (Legislative History of the Labor Management Relations Act, 1947, page 539), in explaining the agreement of the members of the House with the Senate amendment, refers to the fact that the Senate amendment which was finally adopted as Section 8(d) (4) of the statute, provides that:

"The parties shall continue in full force and effect, without resorting to *strike or lockout,* all the terms of the existing contract for a period of 60 days * * *."

Senate Report No. 105 on Senate Bill 1126 (which is the original Senate draft of the Taft-Hartley Act) reads in part as follows:

"Clearly a *strike or lockout* during the 60-day period would constitute an unfair labor practice."   (Legislative History p. 483.)

House Report No. 245 on H.R. 3020 (which is the original House draft of the Taft-Hartley Act), in explaining the provisions of the bill in its original form, reads in part as follows:

"5.   If agreement is not reached within the 30-day period, the parties must, before *striking or locking out,* take the following steps:

"6.(a)   Within 5 days, the union must notify the Administrator of the National Labor Relations Act of its desire for a strike vote.  (b)   It must state to the employees in writing its position on the issues in dispute, and send copies of the statement to the employer and to the Administrator by registered mail.  (c)   The Administrator must notify the employer of the request for a strike vote and specify a reasonable time within which the employer shall issue to employees a statement of his position.  (d)   The employer must issue such a statement to the employees and send it to the Administrator by registered mail.  (e)   The Administrator must, within a reasonable time, and after notice to the parties, provide for a secret ballot.  (f)   The ballot shall be conducted in a manner to which the parties may agree, or, if they do not agree, under the direction of the Administrator.   (He may use local agen-

2.  This appears in the fourth paragraph of the Findings and Policies, Section 1, as follows:
   "Experience has further demonstrated that certain practices by some labor organizations, their officers, and members have the intent or the necessary effect of burdening or obstructing commerce by preventing the free flow of goods in such commerce through strikes and other forms of industrial unrest or through concerted activities which impair the interest of the public in the free flow of such commerce.  The elimination of such practices is a necessary condition to the assurance of the rights herein guaranteed."

3.  The italicizing in the matter hereafter quoted is added.

cies for this purpose if he so desires.)
(g) The ballot, besides stating its nature, shall present to the employees the question: 'Shall the employer's last offer of settlement of the current dispute be rejected and a strike be called.'
(h) *The parties shall not strike or lockout* unless the majority of all the employees in the bargaining unit in which the dispute arises vote to reject the employer's last offer, and to strike."
(Legislative History of the Labor Management Relations Act, 1947, pp. 312 and 313.)

On the same subject House Minority Report No. 245 on H.R. 3020 reads in part as follows:

"Since under Section 8(b) (2) unions are also required to bargain collectively with employers, this subsection means that neither party to the dispute need do more than go through a pretense of bargaining before engaging in a strike or lockout. The present act is designed to encourage collective agreements; this bill makes collective bargaining a matter of certain formalities to be complied with before engaging *in a strike or lockout.* It is clear that its only effect can be to encourage industrial strife, and discourage the making of collective agreements.

"Section 2(11) (B) (vi) states the requirements which must be met before a *strike or lockout* is called and, in essence, requires the holding of a strike vote in which employees have an opportunity to accept or reject the employer's last offer. The effect of these provisions is to revive the unfortunate experience of the Smith-Connally Act and to interject the Federal Government still further into the bargaining process." (Legislative History, p. 361.)

And again the House Minority Report under the subheading, "Denial of Collective Bargaining," declares as follows:

"Section 8(a) (5) makes it an unfair labor practice for the employer to refuse to bargain collectively with representatives of his employees. In isola-tion the obligation appears to encourage the voluntary settlement of differences and the reaching of accord with employee organizations. However, when considered in connection with section 2(11), wherein the terms 'bargain collectively' and 'collective bargaining' are defined, it becomes clear that the authors of the bill have no such intent. As we have pointed out heretofore, the concept of bargaining under this statute merely imposes formalistic procedures *before a strike or lock-out becomes legal.* There is no genuine guaranty that either the employer or the employees' organization must meet in a free atmosphere with an unfettered desire to compose differences and reach accord. This section of the bill can only lead to a complete reversal of the desirable and encouraging trend of recent years that has resulted in a genuinely harmonious relationship in large areas of American industry. It is, again, an open invitation to industrial strife." (Legislative History, p. 373.)

Title II of the statute relating to conciliation of labor disputes in industries affecting commerce, amounting to national emergencies, creates a Federal Mediation and Conciliation Service under the direction of a Director. The statute provides in part:

"Sec. 203(c) If the Director is not able to bring the parties to agreement by conciliation within a reasonable time, he shall seek to induce the parties voluntarily to seek other means of settling the dispute *without resort to strike, lock-out, or other coercion,* including the submission to the employees in the bargaining unit of the employer's last offer of settlement for approval or rejection in a secret ballot. * * *"

With reference to national emergency strikes, Section 206 of the Taft-Hartley Act reads as follows:

"Whenever in the opinion of the President of the United States, a threatened or *actual strike or lock-out affecting an entire industry* or a substantial part thereof engaged in trade,

commerce, transportation, transmission, or communication among the several States or with foreign nations, or engaged in the production of goods for commerce, will, if permitted to occur or to continue, imperil the national health or safety, he may appoint a board of inquiry to inquire into the issues involved in the dispute and to make a written report to him within such time as he shall prescribe. Such report shall include a statement of the facts with respect to the dispute, including each party's statement of its position but shall not contain any recommendations. The President shall file a copy of such report with the Service and shall make its contents available to the public."

Section 208(a) of the statute reads in part as follows:

"Upon receiving a report from a board of inquiry the President may direct the Attorney General to petition any district court of the United States having jurisdiction of the parties to enjoin such *strike or lockout* or the continuing thereof, and if the court finds that such threatened or actual *strike or lock-out*—

"(i) affects an entire industry or a substantial part thereof engaged in trade, commerce, transportation, transmission, or communication among the several States or with foreign nations, or engaged in the production of goods for commerce; and (ii) if permitted to occur or to continue, will imperil the national health or safety, it shall have jurisdiction to enjoin *any such strike or lock-out,* or the continuing thereof, and to make such other orders as may be appropriate."

The procedure following issuance of the injunction is spelled out in Sections 209 and 210 of the statute. Briefly speaking, Section 209 provides for a secret ballot vote of the employees on the final offer of the employer. Section 210 then provides:

"Upon the certification of the results of such ballot or upon a settlement being reached, whichever happens sooner,

the Attorney General shall move the court to discharge the injunction, which motion shall then be granted and the injunction discharged. * * *"

From the above expressions in the statute and the linking of the terms "strike" and "lockout," it is arguable that Congress has recognized strikes and lockouts as correlative powers, to be employed by the adversaries in collective bargaining when an impasse in negotiations is reached.

The Seventh Circuit in Morand Bros. Beverage Co. v. N. L. R. B., 190 F.2d 576, 582, had before it for review a case identical with that before us, save that it was contended there that the lockout by the multi-employer unit was a discharge and not a temporary lay-off. In an able opinion by Circuit Judge Lindley that court stated that the temporary lockout

"* * * should be recognized for what it actually is, i. e., the employer's means of exerting economic pressure on the union, a corollary of the union's right to strike. Consequently, once petitioners had exhausted the possibilities of good faith collective bargaining with the Union through their Associations, any or all of them were free to exercise their right to lock out their salesmen *without waiting for a strike, just* as the Union was free to call a strike against any or all of them."

On the disputed question of fact as to whether it was a temporary lockout or a permanent discharge, the opinion stated that such a discharge violated the Act and remanded to the Board for the determination of the lockout's character and further proceedings.

The Dealers urge strongly that on the statement of facts here we should follow the Seventh Circuit and hold that a temporary lockout, which is not such a reprisal as was found by the Board, would not support the Board's order. At the hearing we repeatedly asked the attorneys of the Board to advise us of their views with regard to the Dealers' contention. This the Board's attorney repeatedly declined to do. He reiterated this position in the Board's brief and said that this court should refrain from

passing on this disputed question, but should leave it to be decided in the first instance by the Board. In this the Board is supported by such decisions as Texas & Pacific R. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553, Armour & Co. v. Alton R. Co., 312 U.S. 195, 61 S.Ct. 498, 85 L.Ed. 771, International Brotherhood, etc., v. International Union, etc., 9 Cir., 106 F.2d 871, and Trans-Pacific Airlines v. Hawaiian Airlines, 9 Cir., 174 F.2d 63, which we have concluded to follow.

 We order the case remanded to the Board to determine its action on the evidence now before it, where as here there has been a temporary lockout which is not such a reprisal as found by the Board.