**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SPALDING AVERY LUMBER COMPANY et al., Respondents.**

**No. 15113.**

United States Court of Appeals,
Eighth Circuit.

April 7, 1955.

Duane B. Beeson, Atty., National Labor Relations Board, Washington, D. C. (George J. Bott, General Counsel, David P. Findling, Associate General Counsel, and Bernard Dunau, Atty., National Labor Relations Board, Washington, D. C.,

were with him on the brief), for petitioner.

Jesse E. Marshall, Sioux City, Iowa, for respondents.

Before GARDNER, Chief Judge, and COLLET and VAN OOSTERHOUT, Circuit Judges.

GARDNER, Chief Judge.

This matter is before us on petition of the National Labor Relations Board to enforce its order requiring respondents to cease and desist from:

"(a) Discouraging membership in General Drivers, Warehousemen and Helpers Local Union No. 383, affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, A. F. of L., or in any other labor organization of its employees, by locking them out or otherwise discriminating in regard to their hire and tenure of employment or any term or condition of employment;

"(b) In any other manner interfering with, restraining, or coercing its employees in the exercise of the right to self-organization, to form labor organizations, to join or assist General Drivers, Warehousemen and Helpers Local Union No. 383, affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, A. F. of L., or any other labor organization, to bargain collectively through representatives of their own choosing, to engage in concerted activities for the purposes of collective bargaining or other mutual aid or protection, or to refrain from any or all of such activities, except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in Section 8(a) (3) of the Act [29 U.S.C.A. § 158(a) (3)]."

and to take certain appropriate affirmative action. At all times pertinent to the issues here involved respondents were engaged in retailing coal, lumber, liquid fuels and related products at Sioux City, Iowa and South Sioux City, Nebraska. They were all members of a non-profit corporation known in the record as the Sioux City Coal Merchants Association. The employees of the respondents for collective bargaining purposes were represented by General Drivers, Warehousemen and Helpers Local Union No. 383, affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, A. F. of L., while respondents were represented by the Sioux City Coal Merchants Association, and various contracts had been negotiated between the employees and the respondents, the last of which was negotiated November 5, 1951, for a period ending March 31, 1952, and from year to year thereafter in the absence of sixty days' notice to modify or terminate.

On January 28, 1952, the Union requested and on January 29, 1952, the representative of the Association agreed to negotiations for changes in the then current contract. The negotiations were carried on on behalf of respondents by a committee of their Association and on behalf of the employees by a committee of their Union. These negotiations continued up until about July 15, 1952, without agreement as to the terms and conditions of a new contract. On July 17, 1952, the Union notified the Association that it desired to bargain separately with each individual member of the Association. In response to this notice the Association speaking for the respondents on July 18, 1952, wrote the Union saying in part:

"* * * They all feel that in view of the long history of collective bargaining as an association and the fact that contracts have been so negotiated for a number of years, that we should continue, if possible, in that manner.

"However, they are all willing to make a good faith effort to reach an agreement by individual bargaining if that is your desire.

"Accordingly, I am authorized by each of the individual employers to arrange with you for bargaining conferences at your convenience."
* * * "

On the following day the Union speaking for the employees wrote the Association saying:

"Received your letter this A.M. and would be pleased to meet with you.

"Strike notice has been sent to Mr. Walensky & Mr. Schoeneman for Wed. 7 A.M. July 23, 1952 copy of which I am enclosing herewith.

"If you desire a meeting please advise."

Responding to this action by the Union the Association wrote the Union saying in part that:

"I have your letter of July 19, 1952, enclosing copy of letter of July 19th sent to Walensky Lumber Company and the Schoeneman Lumber Company advising that a strike will be called against the two named companies at 7:00 o'clock A.M., Wednesday, July 23, 1952.

"We had assumed that the Union desired a negotiating conference with these companies to attempt to work out individual contracts prior to taking strike action. However, you have apparently concluded that such conferences would be ineffective in view of the history of bargaining with the Association representing the Employers.

"At a meeting of the individual members of the Employers Association held today, I was authorized and directed to advise that in the event of strike action being taken by the Union against any individual member or members of the Association, all Association members will treat such action as a strike against each of them and will act accordingly. * * * "

Following these preliminary negotiations the respondents on July 22, 1952, notified their employees that they were being laid off because the Union had called a strike against respondents Walensky Lumber Company and Schoeneman Lumber Company.

Negotiations between the Union and the Association were resumed on the 28th day of July, 1952, and a settlement was finally agreed upon and a new contract was negotiated on August 7, 1952. There were no negotiations between the Union and the individual respondents.

It was the contention of respondents before the Board, and they renew that contention here, that the lockout was solely for economic reasons and hence did not constitute a violation of the Act. But the Board, expressing the view that conceding *arguendo* that the lockout was solely for economic reasons, concluded that the respondents thereby " * * * restrained and coerced their employees in the exercise of rights guaranteed by Section 7 of the Act [29 U.S.C.A. § 157], and discriminated to discourage membership in the Union, thereby violating Section 8(a) (1) and (3) of the Act." The Board also concluded that the respondents by consenting to individual bargaining had abandoned their right to resort to economic lockout. Further facts will be developed during the course of this opinion.

The Board in seeking enforcement of its order has abandoned its contention that the respondents were not entitled to lock out their employees solely for economic reasons in view of the decision of the Ninth Circuit in Leonard v. National Labor Relations Board, 205 F.2d 355, and the decision of the Seventh Circuit in Morand Bros. Beverage Co. v. National Labor Relations Board, 190 F.2d 576, but it now seeks to sustain its order solely on the ground that the respondents consented to individual employer bargaining and by so doing abandoned their right to act in concert for economic reasons. The facts in Leonard v. National Labor Relations Board, supra, are strikingly similar to those in the instant case in many particulars and the law as announced in the opinion of Chief Judge Denman is here peculiarly apposite. In the course of the opinion in sustaining the right of a group of employers temporarily to lock out their employees it is among other things said:

"The pertinent facts are that the single union of all the employees of the eleven Dealers was engaged in active negotiations with all the Dealers as a unit for an amendment of an existing agreement between them as to wages and conditions of employment. While the negotiations were pending, the union, by a vote of the employees of all the firms of the Dealers' unit, had called a strike, which followed, of the employees of one of the members of the Dealers, the Union Furniture Company. The latter company at the time the strike was called was complying with all the provisions of the then existing agreement.

"The union leader in charge of the strike called it on the particular dealer as the beginning of an announced 'whipsawing process' against one after another of the remaining ten, which well could result in strikes against all the Dealers.

"The effect of such a recurrent whipsawing process is obvious. No one of the ten remaining dealers could know whether or not its store was next to have its employees sawed off in the continued whipping. Hence none could feel it safe to take orders from its customers on which they would be embarrassed by non-deliveries to them. Likewise, no dealer was safe in placing orders for furniture with the manufacturers, which well might find no employee to unload it in their stores, or if so delivered to the stores it would lie as depreciating overstocked inventories.

"To meet this powerful and effective economic coercion by all their employees, the ten remaining Deal-

ers temporarily locked them out though retaining them on their payrolls—but as not working and earning pay—and treating them as employees with protection as to seniority and other benefits when the dispute was settled."

But it is argued that respondents gave up multi-employer bargaining in favor of single employer bargaining. This transformation is said to have resulted from the letters passing between representatives of the Union and respondents above set out. In the final analysis, therefore, the question now before us is a very narrow one. Did the preliminary negotiations reflected in the aforementioned letters so change the relation of the parties that the respondents had no common and joint economic interest to protect?

It is to be noted that there was nothing more than preliminary negotiations none of which resulted in a course of action. The letter from the Union was in the nature of a preliminary invitation to bargain individually with respondents while the letter of respondents was at most an assent to an effort to settle the differences between the groups by such proposed negotiations. However, the Union at once repudiated its own proposal to bargain individually by calling a strike at two of the industries, and no action by either party was ever taken pursuant to these preliminary negotiations. The respondents, to prevent a whipsawing process, as that term is defined in Leonard v. National Labor Relations Board, supra, temporarily locked out their employees and thereafter bargaining was resumed between the representatives of the respondents as a group and the Union, and not between individual respondents and the Union. The Union in calling these strikes in effect repudiated its own proposal to bargain individually and the respondents were certainly relieved from any further obligations to pursue their efforts to assist and promote bargaining with individual respondents.

The author of the article on Contracts as published in Volume 12, American Jurisprudence, page 526, in distinguishing preliminary negotiations from offers, among other things says:

"If a proposal is one merely to open negotiations which may or may not ultimately result in a contract, it is not binding though accepted. An invitation to enter into negotiations is not an offer which, together with the acceptance thereof, forms a contract. Such a proposal may be merely a suggestion to induce offers by others. Care should be taken not to construe as offers letters which are intended merely as preliminary negotiations."

To hold in the instant case that these preliminary negotiations resulted in a binding agreement to abandon multi-employer bargaining in favor of single employer bargaining would put a premium on sharp practice. As a matter of law, in the circumstances disclosed by this record, we hold that there was no abandonment by the respondents of their right as a group to resort to a temporary economic lockout of their employees. Enforcement of the order will therefore be denied.