231 F.2d 110
 TRUCK DRIVERS LOCAL UNION NO. 449, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, A. F. OF L., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 No. 86.
 Docket No. 23424.
 United States Court of Appeals Second Circuit.
 Argued October 14, 1955.
 Decided February 14, 1956.
 
 Thomas P. McMahon, McMahon & Crotty, Buffalo, N. Y., for petitioner.
 Theophil C. Kammholz, David P. Findling, Marcel Mallet-Prevost, Norton J. Come and Duane B. Beeson, for National Labor Relations Board.
 Louis Borins, Isadore Snitzer, Buffalo, N. Y., for Linen and Credit Exchange.
 Before CLARK, FRANK and WATERMAN, Circuit Judges.
 FRANK, Circuit Judge.
 
 
 1
 Truck Drivers Local Union No. 449, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, A. F. of L. (hereinafter referred to as the Union) seeks review under § 10 of the Labor Management Relations Act of 1947, 61 Stat. 136, 29 U.S.C. A. § 151 et seq. (hereinafter referred to as the Act) of an order of the National Labor Relations Board, dismissing an unfair-labor-practices complaint in which it is the charging party. The Union asks that the order of the Board be set aside. The decision of the Board is reported at 109 N.L.R.B. 447.
 
 
 2
 The case was tried on an agreed state of facts which are substantially as follows:
 
 
 3
 The Union represents all the truck-driver employees of the members of the Linen and Credit Exchange (hereinafter called Exchange), an employer association representing eight employers in collective bargaining negotiations with the Union. However, it does not appear from the stipulated facts that the Union has been certified by the Board as bargaining agent for the association-wide unit. The terms of the agreements were worked out by the representatives of Exchange and the Union, and then submitted to the membership of Exchange and the Union for majority approval. When majority approval was given, the agreement was signed by each member of Exchange and by the Union. This had been the practice for the thirteen years preceding this controversy.
 
 
 4
 Sixty days before April 30, 1953, when the contract (which contained an automatic renewal clause requiring notice of a desire to change the contract to be given sixty days before the expiration date) was to expire, the Union notified Exchange of its desire to open negotiations to change the agreement. In March, 1953, negotiations were begun for a new collective bargaining agreement. Meetings were held during the succeeding weeks but no agreement was reached. On May 26, 1953, the truck-driver employees of Frontier Linen Supply, Inc., a member of Exchange, went on strike, but the employees of the other seven members remained on the job.
 
 
 5
 On the evening that the strike against Frontier began, Exchange notified the Union that the other members were laying off all their truck-driver employees until the strike at Frontier was ended. A lockout by these seven members of Exchange followed; at the succeeding negotiations, the Union was told that the employees of all such members would be recalled to work if the picket-line at Frontier were withdrawn and the strike terminated.
 
 
 6
 On June 3, 1953, agreement was reached on a new contract which was uniformly applicable to all members of Exchange, including Frontier. Both the strike and the lockout were then terminated, and the employees of all the members returned to work. The Union thereupon filed a complaint with the Board charging Exchange, and the seven members who had locked out their employees, with unfair-labor practices in violation of § 8(a) (3) and (1) of the Labor Management Relations Act of 1947. The Board overruled the determination of the trial examiner that these employers had engaged in unfair labor practices by locking out the non-striking employees, and dismissed the complaint. The Board held that the strike against Frontier constituted a threat of a strike against all the other members of Exchange and that the non-struck members were justified in locking out their employees until the strike against Frontier ended.
 
 
 7
 The Union contends that there was no evidence of a threat of a strike against the employers other than Frontier. We think, however, that the Board reasonably inferred such a threat. For previously the Union had conducted its negotiations with Exchange, but here, during such negotiations, it began a strike against Frontier, one member of the Exchange, although there was no peculiar facts concerning the Union's relations with that single member.
 
 
 8
 We come then to the question at the heart of the case, i. e., whether the threat of a strike legalized the lockouts by those employers against whom no strike had been called.
 
 
 9
 No provision of the L. M. R. A. of 1947, by its terms, generally or specifically prohibits or authorizes lockouts by employers; and the Board, in its opinion, states that it does not hold that the employer's right to lock out its employees is the corollary of the employees' statutory right to strike. In addition, § 7 of the Act guarantees employees the right to engage in "concerted activities" for their "mutual aid or protection"; and it has been held that the right to strike and to support a strike constitutes "concerted activity" which is protected by the statute.[1] Interference with this right by the employer constitutes an unfair labor practice under § 8(a) (1) of the Act, and a lockout prompted by a purpose to defeat employee organization or otherwise protected concerted activities is violative of the Act.[2] Such a lockout would also violate § 8(a) (3) of the Act.[3]
 
 
 10
 The Board, in its brief, concedes, as it must, the basic principle that an employer who locks out its employees on mere threat of, or in anticipation of, a strike is guilty of an unfair labor practice. Up to the time of the decision in the instant case, the Board has held that only in unusual cases of economic hardship is an employer justified in locking out its employees when faced with a threatened strike. Thus, it has held that an employer may close down operations where (1) a spoilage of materials would otherwise result, Duluth Bottling Association, 48 N.L.R.B. 1335, 1336, 1359-60; (2) the prospective work stoppage in one of several integrated departments threatens to be of a recurrent nature so that it is difficult for the employer to plan production, International Shoe Company, 93 N.L.R.B. 907; or (3) the Union's refusal to give assurance of sufficient advance notice to allow repair work in progress to be finished and returned to customers, renders it economically imprudent for the employer to continue operations, Betts Cadillac Olds, Inc., 96 N.L.R.B. 268.[4]
 
 
 11
 The Board also concedes in its brief that, "prior to this case, a majority of the Board had interpreted the Act as precluding the non-struck members of an employer unit from utilizing a lockout." See Morand Bros. Beverage Co., 99 N.L. R.B. 1448 (on remand); Davis Furniture Company, 94 N.L.R.B. 279, 100 N.L. R.B. 1016 (on remand). In the instant case, the Board departed from its previous position by adopting the position of the Ninth Circuit in Leonard v. N. L. R. B., 9 Cir., 197 F.2d 435, Id., 9 Cir., 205 F.2d 355.[5]
 
 
 12
 In its second opinion in the Leonard case, 205 F.2d 355, which the Board cited in its opinion here, the Ninth Circuit apparently felt that "whipsawing" (calling a strike against one employer — in a multi-employer unit — at a time) caused economic and operational difficulties such as justified a lockout in cases like Duluth Bottling Association, supra. The court stated at 205 F.2d 355, 356:
 
 
 13
 "The effect of such a recurrent whipsawing process is obvious. No one of the ten remaining dealers could know whether or not its store was next to have its employees sawed off in the continued whipping. Hence none could feel it safe to take orders from its customers on which they would be embarrassed by non-deliveries to them. Likewise, no dealer was safe in placing orders for furniture with the manufacturers, which might well find no employee to unload it in their stores, or if so delivered to the stores it would lie as depreciating overstocked inventories."
 
 
 14
 We think this reasoning of the Ninth Circuit erroneous. The court's rationale would apply as well to cases involving only a single employer threatened with a strike. For he, too, would be faced with the prospect of disappointing his customers or being left with large depreciating inventories. Yet the Board correctly admits that he would not be justified in locking out his employees when they threaten to strike.
 
 
 15
 The Ninth Circuit also reasoned that its decision was necessary because a strike against any one member of an association would find that member too weak economically to stand up. We seriously doubt whether mere proof of such weakness of an employer, when threatened with a strike, justifies him in utilizing a lockout. But we need not here consider that question. For there is no proof here, and no finding, that any of the employers who locked out was thus economically weak. On the contrary, according to the stipulated facts, the sole reason for the lockouts was the strike against a single member of the association and a desire to end that strike.
 
 
 16
 The Ninth Circuit regarded as significant the linking of the term "strike and lockout" in the statute, and on that basis concluded that Congress recognizes the two as correlative economic powers. But we think the Board, in Davis Furniture Company, 100 N.L.R.B. 1015, 1019, correctly noted that, in each instance where those two words are linked, a particular strike activity is proscribed as unlawful, and the specific inclusion of "lockout" in this context may well have stemmed "from a desire to emphasize even-handed justice where union activity was being restricted." We think the Board in that case was also correct in saying: "We find nothing in the Act which equates lawful strikes and lockouts. On the contrary, only the right to strike is expressly reserved by Congress in Section 13 of the Act. The absence of any similar expressed reservation of the right to lockout strongly argues against any intent to establish that right."[6]
 
 
 17
 The Board, although relying on the decision of the Ninth Circuit in Leonard, goes somewhat further in its reasoning. It seeks to support its new ruling in various ways: (1) Although the threat of a strike involved no peculiar economic hardship to any of the employers not on strike, nevertheless the case comes within the exceptional economic hardship category because the strike against Frontier involved the "destruction of the unitary system of bargaining." (2) Because of the previous bargaining with Exchange, a strike against one member was the equivalent of a strike against all.
 
 
 18
 The Board's position, no matter how stated, thus comes to this: (1) A union cannot be compelled to bargain in the first instance with several independent employers solely through an association of those employers; (2) however, if the union has so bargained for several years, then, by this voluntary action on its part, it becomes obligated to continue bargaining exclusively with the employer association, at least to the extent that, if it strikes against one member of the association, lockouts by the other members become lawful although the lockouts would otherwise be unlawful as unfair labor practices. Such a ruling constitutes unauthorized legislation by the Board in which we cannot acquiesce.
 
 
 19
 The Board has consistently held in the past that any employer may withdraw at will from a multi-employer bargaining unit, despite a history of multi-employer bargaining.[7] Although it would seem only fair that the union be accorded the same privilege of voluntary withdrawal as is enjoyed by the employer, the Board has limited a union's right to withdraw from a multi-employer unit where there is such a history of multi-employer bargaining. In Stouffer Corp., 101 N.L.R. B. 1331, the Board denied the union's petition, under § 9(c) of the Act, in which the union sought to have the Board find the appropriate bargaining unit to be the employees of a single member of an employers' association rather than those of all members in the association with which the union had bargained for the preceding ten years.[8] And in Morand Brothers Beverage Co., 91 N.L.R.B. 409, the Board, passing on a charge of unfair labor practice on the part of the union in refusing to bargain, intimated that the union must bargain to the point of an impasse with the employer association before it may validly revert to individual bargaining with each member of the association.
 
 
 20
 We see no rational basis for holding, in any context, that at any time any particular employer may, at his will, withdraw from bargaining through an employers' association of which he is a member, while a union is not equally free to discontinue bargaining through such an association with respect to any particular employer member.[9] On that account, were the issue here that of the appropriate unit in which the union must bargain — concerning which the exercise of the Board's discretion is usually accorded great weight[10] — we would be inclined to think that the Board would "abuse" its discretion in forcing a union to continue bargaining with a multi-employer unit against the union's wishes. In any event, we think that the union here met the test established by the Board in the Morand case, i. e., an impasse in the bargaining with the association had been reached before the Union called a strike at Frontier.[11]
 
 
 21
 The issue here, however, is not the appropriate unit for collective bargaining purposes, but whether a lawful strike against one member of Exchange justified a lockout by the other members. There was no claim here that the Union had refused to bargain; nor did the Union seek certification as representative of a unit smaller than the association-wide unit as in the Stouffer case, supra. Consequently, here the Board had no occasion to exercise its discretion to determine the appropriate bargaining unit.[12] Hence, we do not intrude on the exercise of the Board's discretionary power to make such a determination when we hold that the Union had a right to withdraw from the multi-employer unit by calling a strike against only one member of Exchange, at least to the extent that the calling of that strike did not render the lockout lawful.
 
 
 22
 The arguments against legalizing lockouts, merely because a multi-employer unit is involved, were set out by the Board itself in the Morand case, 91 N.L.R.B. 409, 412-415, where the Board said, inter alia: "In our opinion, the Act does not permit a discharge to reduce, by anticipatory action, the effectiveness of an expected strike by a labor organization. The Board has held, with judicial approval, that an employer's economic interest in preventing a strike does not justify him in engaging in conduct of the type proscribed by the Act. The fact that the expected strike may be so timed or so directed as to place severe economic pressure on the employer does not, in our judgment, remove the strikers from the protection of the Act. Strike activity, actual or threatened, is concerted activity, and concerted activity does not cease to be protected merely because it is, or may be, effective, or because it subjects the employer to economic hardship. Any other view would not only be in derogation of the right of employees to engage in concerted activities but would also conflict with the express policy of the Act to minimize industrial strife. * * * Thus, if in the instant case we accepted the respondents' view * * *, we would be required to hold that a strike against one respondent * * * directly involving only about sixty of its employees, justified the other thirty-four respondents in discharging about seven hundred of their employees, even though they had not participated in the strike but had, in fact, remained at work. As stated in the brief filed on behalf of the General Counsel in support of the Intermediate Report: `In this case, the effect of granting immunity to the discriminatory lockout by thirty-four employers, in reprisal against the strike against a thirty-fifth employer, would be to multiply the obstruction to commerce. It would set a sweeping precedent for the conversion of any single employer's dispute into an association-wide or industry-wide dispute. An isolated skirmish would become a civil war' * * * The logical corollary of the respondents' position is, therefore, that a union seeking to negotiate a contract with a group of employers, however large, must strike all or none. If it strikes less than all, its members will be deprived of the protection of the Act; if it strikes all, they will be protected.[13] We cannot give such an incongruous construction to an Act designated to minimize industrial strife. * * * To hold that employees in a multi-employer unit who remain at work may be treated as strikers, solely because of a strike by other employees, would involve the introduction of a new concept in labor relations — i. e., the vicarious or constructive strike. We know of no legislative or other warrant for introducing such a concept."
 
 
 23
 Multi-employer bargaining has never received the express sanction of Congress. It would stretch the usual canons of interpretation unduly far to conclude that, in enacting the Taft-Hartley Act, Congress gave legislative approval to all the previous Board rulings concerning such bargaining.[14] Even if we assume that it did, still the Board at that time had not gone to the extreme lengths to which it now seeks to go in order to maintain the "stability of the employer unit."[15] We think Congress must have intended that such a radical innovation be left open for consideration by the joint committee it set up under § 402 of the Act to study, among other things, "the methods and procedures for best carrying out the collective-bargaining processes, with special attention to the effects of industry-wide or regional bargaining upon the national economy".
 
 
 24
 We feel the Board's action in restricting employees in the exercise of rights which Congress has expressly protected, merely to effectuate a policy as to which Congress has, as yet, expressed no clear opinion, constitutes an abuse of the Board's legitimate authority under the Act and a usurpation of the power of Congress. Neither the Board nor the courts may make so fundamental a change in the existing law as that which would result from the Board's decision. The problems involved in legalizing the lockout in multi-employer situations are manifold, and their solution must be left to Congress.
 
 
 25
 Since the stipulated facts show no economic justification for the lockout, we hold that the lockout of non-striking employees constituted an interference with their statutory right to engage in concerted activity in violation of § 8(a) (1) of the Act, and also constituted discrimination in the hire and tenure of employment of the employees because of the Union's action, thereby discouraging membership in the Union in violation of § 8(a) (3) of the Act.
 
 
 26
 The Board's order and decision dismissing the complaint must be set aside. The case is remanded to the Board for further proceedings in conformity with this opinion.
 
 
 
 Notes:
 
 
 [1]
 Amalgamated Association of Street, Electric Railway & Motor Coach Employees of America v. Wisconsin Employment Relations Board, 340 U.S. 383, 389-390, 71 S.Ct. 359, 95 L.Ed. 364; International Union of United Automobile, etc., Workers of America, C. I. O. v. O'Brien, 339 U.S. 454, 456-457, 70 S.Ct. 781, 94 L.Ed. 978; N. L. R. B. v. Fansteel Metallurgical Corp., 306 U.S. 240, 255-256, 59 S.Ct. 490, 83 L.Ed. 627
 
 
 [2]
 N. L. R. B. v. Wallick, 3 Cir., 198 F. 2d 477; N. L. R. B. v. Somerset Classics, Inc., 2 Cir., 193 F.2d 613, certiorari denied Modern Mfg. Co. v. N. L. R. B., 344 U.S. 816, 73 S.Ct. 10, 97 L.Ed. 635; Olin Industries, Inc., Winchester Repeating Arms Co. Division v. N. L. R. B., 5 Cir., 191 F.2d 613, certiorari denied 343 U.S. 919, 72 S.Ct. 676, 96 L.Ed. 1332. See also Koretz, Legality of the Lockout, 4 Syracuse L.Rev. 251, 253-254 (1953); Note, 3 Stanford L.Rev. 510, 517 (1951)
 
 
 [3]
 Associated Press v. N. L. R. B., 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953; N. L. R. B. v. Wallick, 3 Cir., 198 F.2d 477; N. L. R. B. v. Somerset Classics, Inc., 2 Cir., 193 F.2d 613, certiorari denied Modern Mfg. Co. v. N. L. R. B., 344 U.S. 816, 73 S.Ct. 10, 97 L.Ed. 635; Morand Bros. Beverage Co., 99 N.L. R.B. 1448, 1460-1466 (on remand)
 
 
 [4]
 See also Associated General Contractors, 105 N.L.R.B. 767
 The Trial Examiner found that "* * there was no showing that there were any economic considerations which justified the lockout, and none that the respondents' motive was in fact the protection of their economic interests." Buffalo Linen Supply Co., 109 N.L.R.B. 447, 454.
 
 
 [5]
 Other circuits, in dicta, have expressed views similar to those of the Ninth Circuit. N. L. R. B. v. Continental Baking Co., 8 Cir., 221 F.2d 427, 431-432; N. L. R. B. v. Spalding Avery Lumber Co., 8 Cir., 220 F.2d 673; Morand Bros. Beverage Co. v. N. L. R. B., 7 Cir., 190 F.2d 576, 582
 
 
 [6]
 In answering the argument that lockouts and strikes should be equated, the Board stated at 100 N.L.R.B. 1020-21, "* * * Nor is the notion correct that strikes and lockouts are `commensurate weapons' in collective bargaining and that without the right to lockout an employer has no comparable economic weapon. Faced with an impasse in bargaining, the employer still retains control of the terms of employment so long as production continues. He is free to continue the existing terms without any contract, or, indeed, unilaterally to institute any previously proposed changes in those terms. These courses of action are obviously not available to the union * * Even if the employer is unable to get replacements to permit continued operation in the face of a strike, he is generally in no worse position than the strikers. Both adversaries in the conflict would in such case be under the same economic pressure to terminate the strike and restore the flow of wages and profits. We see no reason in equity or justice to give to employers the privilege of extending the hardship and deprivations of industrial conflict to areas not directly involved, nor could such a privilege be squared with the basic policy of the statute to minimize industrial strife and interruptions to commerce."
 
 
 [7]
 See, e. g., Bearing & Rim Supply Co., 107 N.L.R.B. 101; Association of Motion Picture Producers, 88 N.L.R.B. 1155, 1161; Johnson Optical Company, et al., 87 N.L.R.B. 539; Air Conditioning Company of Southern California, 81 N.L.R.B. 946, 952; General Baking Company, 73 N.L.R.B. 44, 47. See also Freiden, The Taft-Hartley Act and Multi-Employer Bargaining (1948) p. 16; Broderick, Representation Proceedings, University of Illinois Law Forum (1955) 223, 237-238; Note, 3 Stanford L.Rev. 510, 515
 This practice apparently was acceptable to Congress and was approved by it. See 1 Legislative History of The Labor Management Relations Act of 1947 (Government Printing Office 1948) p. 102.
 
 
 [8]
 Our views on mutuality of treatment of unions and employers are limited to situations where, as here, an incumbent union seeks to withdraw from multi-employer bargaining and is not opposed in its claim as to the appropriate bargaining unit by another employee group. Thus we express no opinion on the desirability of Board decisions (1) refusing to let a non-incumbent union conduct a representation election in a single-employer unit where there has been a history of multi-employer bargaining and the incumbent union desires the multiple unit; Des Moines Packing Co., 106 N.L.R.B. 206; Abbotts Dairies, Inc., 97 N.L. R.B. 1064; American Writing Paper Co., 94 N.L.R.B. 1773; Balaban & Katz (Princess Theatre), 87 N.L.R.B. 133; Cloth Laying Appliances Corp., 78 N.L. R.B. 785; (2) denying employees of a single employer a decertification election where their union has, in the past, bargained on a multi-employer basis and desires to continue doing so; Yardley Plastics Co., 111 N.L.R.B. 526; Grand Rapids Fuel Co., 107 N.L.R.B. 1402; (3) denying the incumbent union's request to find a single-employer unit appropriate when a non-incumbent union seeks a representation election in the multi-employer unit with which bargaining had been carried on in the past; see Archie Bernstein, et al., 98 N.L.R.B. 1144; Belle Vernon Milk Co., 90 N.L. R.B. 717
 The Board has indicated that it will allow a union to withdraw from a multi-employer bargaining unit and bargain on an individual basis where the members of the employer association, with which the union had previously bargained, have consented, since it deems this an abandonment of multi-employer bargaining on the part of the employers. Spalding Avery Lumber Co., 103 N.L.R.B. 1516; reversed on the ground that no abandonment of multi-employer bargaining had been intended by the employers, 8 Cir., 220 F.2d 673.
 
 
 [9]
 The importance of mutuality of the right to withdraw was cogently stated by dissenting Commissioner Styles in Continental Baking Company, 99 N.L.R.B. 777, 787-789. See also Note, 3 Stanford L.Rev. 510, 519 (1952)
 
 
 [10]
 See, e. g., Packard Motor Car Co. v. N. L. R. B., 330 U.S. 485, 491, 67 S.Ct. 789, 91 L.Ed. 1040; N. L. R. B. v. Hearst Publications, 322 U.S. 111, 132-135, 64 S.Ct. 851, 88 L.Ed. 1170; N. L. R. B. v. National Broadcasting Co., 2 Cir., 150 F.2d 895, 898
 
 
 [11]
 The Union bargained with Exchange from March, 1953 to May 26, 1953, when it called a strike at Frontier after failing to reach agreement on the terms of a new contract. The trial examiner found that there was an "impasse" in the bargaining
 
 
 [12]
 Section 9(b) of the Act authorizes the Board to determine the "unit appropriate for the purposes of collective bargaining". The Board exercises its power under this section in representation proceedings under § 9 of the Act to determine the exclusive bargaining representative of the employees in the unit which the Board deems is appropriate
 The Board must also determine the appropriate unit for collective bargaining purposes when there is a charge by the union or employer that the other has committed an unfair labor practice under § 8(a) (5) or (b) (3) by refusing to bargain in the appropriate unit.
 Since the question of the "appropriate" unit is applicable only where the issue involves collective bargaining, it can have no relevance to strike activity by the union.
 
 
 [13]
 The difficulty with which a union would be faced if it were placed in the dilemma set forth by the Board can easily be foreseen. For example, if a union representing automobile workers had for several years bargained collectively with a group representing all the automobile manufacturers, a subsequent strike against, say, the Ford Company would justify General Motors in locking out its employees, regardless of the patent fact that the anticipation of a strike against General Motors would cause it no exceptional economic hardship
 Thus, if we were to accept the Board's reasoning in the instant case, in any case where there is a history of multi-employer bargaining, if the union wishes to call a strike, it must wait until it can afford to strike all the employers in the unit; for if it struck only one, the non-struck members of the association could lock out their employees.
 
 
 [14]
 It may well be that Congress, in enacting the Taft-Hartley Act, did not intend to interfere with the then established practice of multi-employer bargaining built up by the Board under the Wagner Act. See Freiden, supra, pp. 17-34
 A review of the legislative history of the amendments to the Act discloses sharp disagreement over the desirability of multi-employer bargaining. The House Bill (H.R. 3020, 80th Cong. 1st Sess., § 9(f) (1)) as passed would have prevented certification of multi-employers units unless they meet certain conditions. Comment was varied and ofttimes sharply critical. See 1 Legislative History of the Labor Management Relations Act of 1947 (Govt. Printing Office 1948) pp. 315, 325-327, 364, 377, 584, 612, 630, 636, 643, 653, 663, 672, 680, 716, 758-767, 772-775, 867-868. Senators Taft, Ball, Donnell, and Jenner proposed to meet the problem by limiting the unions eligible to act as representatives of those "composed solely of employees of one employer, or of employees employed in the same metropolitan district or county by different employers," and to further meet the problem by prohibiting an "international union from coercing a local union in the conduct of negotiations." Id. at 457; 2 Legislative History, 1217-1218. These proposals, which were not passed by the Senate, likewise elicited comment, favorable and unfavorable. Id. at 1217-1256, 1271-1302. Thereafter the proposals relating to multi-employer bargaining were eliminated in conference. 1 Legislative History 550-551.
 
 
 [15]
 The cases concerning the question whether the non-struck employers in an association may lock out their employees after a strike against only one of the employer-members, were all decided after the passage of the Taft-Hartley Act of 1947
 
 
 
 27
 WATERMAN, Circuit Judge (dissenting).
 
 
 28
 The National Labor Relations Board decided in this case that the employer members of this multi-employer bargaining unit did not violate the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., by locking out their employees when the Union, following several weeks of unsuccessful contract negotiations with the group, engaged in a strike against one of the members in support of its demands against all. The Board concluded that the strike against one member "necessarily carried with it an implicit threat of future strike action against any or all of the other members of the [multi-employer bargaining unit]."[1] In these circumstances, and "in the absence of any independent evidence of anti-union motivation," the Board viewed the lockout as "defensive and privileged in nature, rather than retaliatory and unlawful" since it was a necessary means of protecting "the employer solidarity which is the fundamental aim of the multi-employer bargaining relationship."
 
 
 29
 I think that the decision of the Board, which accords with the views of the three Courts of Appeals that have thus far had occasion to consider the problem,[2] is a reasonable and proper construction of the Act. For the reasons set forth below, I would affirm the Board's order dismissing the Union's complaint.
 
 
 30
 1. Not every employer interference with a legitimate concerted activity is proscribed by the Act. Thus, an employer is permitted to replace economic strikers, even though this amounts to a limitation on free exercise of the right to strike. N. L. R. B. v. Mackay Radio & Telegraph Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381. Similarly, where special "economic or operative" problems are presented, an employer may counter a strike threat with an anticipatory lockout. Duluth Bottling Association, 48 N.L.R.B. 1335 (spoilage of materials); International Shoe Co., 93 N.L.R.B. 907 (interruption of production); and Betts Cadillac Olds, Inc., 96 N.L.R.B. 268 (inability to finish repair work). In short, where the right to strike collides with legitimate employer interests, the Act leaves to the Board the task of "working out an adjustment". Republic Aviation Corp. v. N. L. R. B., 324 U.S. 793, at pages 797-798, 65 S.Ct. 982, 985, 89 L.Ed. 1372.
 
 
 31
 2. The employers in a multi-employer bargaining unit have a legitimate and vital interest in the continuance of the established unitary system of bargaining. In this case the eight members of the Exchange are linen supply businesses competing with each other within the Buffalo metropolitan area, and the Union represents the drivers of all Exchange members. The joinder of the employers for purposes of bargaining as a unit with the Union in such circumstances presents a familiar pattern in industrial relations.[3] It allows small employers to bargain on an equal basis with a powerful, industry-wide union, and at the same time avoids the competitive disadvantages resulting from non-uniform contractual terms.[4]
 
 
 32
 3. The Board's accommodation of the legitimate interest of the employers in group bargaining and the right of the employees to strike in support of their demands is a reasonable and proper one. Group bargaining benefits the union and the public as well as the employers. The union minimizes its organizational and administrative expenses; it can more readily standardize wages and other conditions of employment; and it gains security against raiding by other labor organizations.[5] Moreover, insofar as the public is concerned, the experience of the Board and many other specialists in the labor field has shown that strikes within these units tend to be infrequent, and that there is more likely to be full acceptance on both sides of the principle of resolving differences through negotiation.[6] In my judgment the decision from which I am dissenting would tend to undermine these beneficent developments and to convert industrial relations into a pattern of continuous piecemeal strife.
 
 
 33
 The Board argues that the purposes of multi-employer bargaining are to create uniform terms and conditions of employment at the plants of all employers in the unit, and to achieve on a case-by-case basis an approximate balance of power between organized labor and organized management. From the employers' point of view, the Board says, the major advantage of multi-employer bargaining is that it may give the employers sufficient bargaining power to withstand the divisive pressures of whipsawing. When a union representing all of the employees of a multi-employer group engages in a strike against one of the members of the group, even while pretending to bargain with the group as a whole, it is directly attacking an important interest of all the employers in the group — their interest in group bargaining. The Board feels that the multi-employer bargaining unit will not long survive if the non-struck members are not permitted under such circumstances to use their countervailing force against the Union. I think we should accept the experienced judgment of the Board on such matters. The present decision will tend to destroy the equality of bargaining power and reduced incidence of strikes which have been the hallmarks of multi-employer bargaining.
 
 
 34
 Moreover, I agree with the Board that the decision of the Court will permit the Union to keep the benefits which it has derived from multi-employer bargaining, while at the same time nullifying the consideration that made such unit desirable from the employers' standpoint. That is to say that both sides gain certain benefits and accept certain restrictions when they agree to engage in multi-employer bargaining. The union gains important organizational, raiding and standardization advantages, while the employers gain a protection against whipsawing. This decision would deprive employers of this quid pro quo. The Union is enabled to strike the employers one at a time without running the deterrent risks of a unit-wide strike.[7] In this situation, "the right of the employers to lock out temporarily all the employees is no more than equal to the right of the union of all the employees to call out the employees of one after another of the [employers] in the whipsawing manner above described." Leonard v. N. L. R. B., 9 Cir., 205 F.2d 355, 357-358.
 
 
 35
 4. There is nothing in the Act or in its legislative history which deprives the Board of power to adjust the conflicting but legitimate interests of employers and employees in this situation. The Act protects the rights of employees to strike in support of their demands, but this protection is not absolute. It is well settled that employers are not guilty of unfair labor practices when they act in protection of legitimate and vital interests of their own, even though such acts necessarily impinge on the concerted activity of employees. The Act is not a detailed blueprint, but a general guide; and it is the function of the Board to adjust the conflicting interests of employers and employees.[8]
 
 
 36
 Multi-employer bargaining is almost as old as the Act itself. The Board has established many multi-employer bargaining units pursuant to 29 U.S.C.A. § 159(b), and, when established, employers and unions have the reciprocal duty to bargain in that group. 29 U.S.C.A. § 158(a) (5) and (b) (3). Efforts to limit or destroy multi-employer bargaining were made in 1947, but the amended Act (the Taft-Hartley Act) left multi-employer bargaining undisturbed. I do not think it is properly inferable that Congress, by its inaction, meant to leave the question of multi-employer bargaining to be dealt with in future legislation. On the contrary, considering the long history of multi-employer units, it seems more reasonable that Congress intended that the Board should continue its established administrative practice of certifying multi-employer units, and intended to leave to the Board's specialized judgment the inevitable questions concerning multi-employer bargaining bound to arise in the future.
 
 
 
 Notes:
 
 
 [1]
 My colleagues accept this conclusion of the Board, holding that the Board reasonably inferred a threat of strike against the non-struck employers. The only important difference between the facts in this case and those in Leonard v. N. L. R. B., 9 Cir., 197 F.2d 435; Id., 9 Cir., 205 F.2d 355, is that here the Union did not make a public announcement of its intentions
 
 
 [2]
 Leonard v. N. L. R. B., 9 Cir., 197 F. 2d 435; Id., 9 Cir., 205 F.2d 355; Morand Bros. Beverage Co. v. N. L. R. B., 7 Cir., 190 F.2d 576, 582; N. L. R. B. v. Continental Baking Co., 8 Cir., 221 F.2d 427, 431-432; N. L. R. B. v. Spalding Avery Lumber Co., 8 Cir., 220 F.2d 673, 675
 
 
 [3]
 The Board, in its brief, citing Monthly Labor Review, vol. 64, pp. 398, 409 (1947), says that in 1947 there were over 5,000 multi-employer units covering some 4,000,000 employees
 
 
 [4]
 See, e. g., Freiden, The Taft-Hartley Act and Multi-Employer Bargaining, (Univ. of Pennsylvania Press, 1948), p. 5; Garrett and Tripp, Management Problems Implicit in Multi-Employer Bargaining (Univ. of Pennsylvania Press, 1949), pp. 2-3; Kerr and Fisher, Multiple-Employer Bargaining: The San Francisco Experience (Univ. of California Press, 1948), pp. 27-30; Hall, Impact of the Bargaining Unit on Labor Management Relations (Second Annual Conference on Labor, N. Y. U., 1949), pp. 39-40
 
 
 [5]
 Kerr and Randall, Multiple-Employer Bargaining in the Pacific Coast Pulp and Paper Industry (Univ. of Pennsylvania Press, 1948), p. 9; Hall, op. cit. note 4 supra, pp. 43-44
 
 
 [6]
 Hall, op. cit. note 4 supra, p. 44; Kerr and Fisher, op. cit. note 4 supra, p. 40; Kerr and Randall, op. cit. note 5 supra, pp. 27-31; Bahrs, The San Francisco Employers' Council (Univ. of Pennsylvania Press, 1948), pp. 37-39; MacDonald, Bob and Sheifer, Labor Relations in Milk Distribution in the New York Metropolitan Area (Matthew Bender & Co., 1951), pp. 575-577; Hill, Teamsters and Transportation (Am. Council on Public Affairs, 1942), p. 202; Note, 65 Harv. L.Rev. 353, 355
 
 
 [7]
 The majority decision relies heavily on the idea that the Union should be accorded the same freedom of voluntary withdrawal from a multi-employer bargaining unit as the Board has accorded to individual employers. This may be so, but in this case the Union did not seek to withdraw from the unit. It attempted to retain the advantages of group bargaining by pretending to bargain with the multi-employer group, while at the same time taking strike action against one of the members of the group
 
 
 [8]
 "A statute expressive of such large public policy as that on which the National Labor Relations Board is based must be broadly phrased and necessarily carries with it the task of administrative application. There is an area plainly covered by the language of the Act and an area no less plainly without it. But in the nature of things Congress could not catalogue all the devices and stratagems for circumventing the policies of the Act. Nor could it define the whole gamut of remedies to effectuate these policies in an infinite variety of specific situations. Congress met these difficulties by leaving the adaptation of means to end to the empiric process of administration. The exercise of the process was committed to the Board, subject to limited judicial review. Because the relation of remedy to policy is peculiarly a matter for administrative competence, courts must not enter the allowable area of the Board's discretion and must guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy. On the other hand, the power with which Congress invested the Board implies responsibility — the responsibility of exercising its judgment in employing the statutory powers." Phelps Dodge Corp. v. National Labor Relations Board, 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271