QUAKER STATE OIL REFINING COR-
PORATION, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 12707.

United States Court of Appeals
Third Circuit.

Argued March 19, 1959.

Decided June 15, 1959.

Rehearing Denied Aug. 25, 1959.

John G. Wayman, Pittsburgh, Pa. (Joseph G. Armstrong, III, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., William J. McFate, Benjamin G. McFate, McFate, McFate & McFate, Oil City, Pa., on the brief), for petitioner.

Norton J. Come, Washington, D. C. (Jerome D. Fenton, Gen. Counsel, Thomas J. McDermott, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Richard H. Frank, Washington, D. C., Attorney, National Labor Relations Board, on the brief), for respondent.

Before McLAUGHLIN and HASTIE, Circuit Judges, and MORRILL, District Judge.

McLAUGHLIN, Circuit Judge.

Petitioner seeks to review and have set aside a final order of the National Labor Relations Board.[1]

The petitioner operates three refineries, one of which is at Emlenton, Pennsylvania. The Oil Chemical and Atomic Workers International Union and its predecessor has long been the certified collective bargaining representative of the Emlenton plant's production and maintenance workers who are members of Local 11-481. This case originated when unfair labor practice charges were made by the union against the company; they were a consequence of the partial shut-down of the Emlenton refinery on February 7, 1956, the day after a collective bargaining agreement had expired. Negotiations had been in progress for some time but agreement had not yet been reached on a new contract. It was the union's position, through the General Counsel of the Board, that the shut-down coerced the employees in the exercise of their collective bargaining rights, discriminated against the employees so as to discourage union membership, and amounted to a refusal to bargain collectively, all in violation of Section 8(a) (1), (3) and (5) of the Act.[2] The company, however, has consistently maintained that the shut-down was dictated by considerations of plant and personnel safety because it required 72 hours in which to close down elements of the refinery which were dangerous or which could be expensively damaged by freezing if not attended by an adequate work force. After expiration of the contract containing a no-strike clause and without a new one the company felt itself vulnerable to a sudden strike. Additionally, the company asserts that even if the shut-down were not motivated for safety reasons, it was an economic weapon legitimately available to it as a counterfoil to the union's strike weapon. In short, it is the company's position that "No contract, no work" is as applicable to employees by an employer as it is by employees to their employer.

After much testimony, followed by a lengthy and exhaustive analysis of the facts and the inferences reasonably to be drawn therefrom, the trial examiner found as a fact that the company had effected the shut-down in order to induce the union to sign the contract the company wished and that the shut-down was not motivated by fear for the safety of the plant and personnel. The Labor Board narrowly made the same finding with three of the five members holding that the company " * * * did not have reasonable grounds for believing that the union would call a sudden strike to the detriment of the Respondent's vital operating units * * *."

"The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be con-

1. Section 10(f), National Labor Relations Act, 49 Stat. 455 (1935), as amended, 29 U.S.C.A. § 160(f).

2. 29 U.S.C.A. § 158(a) (1), (3) and (5).

clusive."[3] We have concluded without the so often attendant difficulty that the Board's finding is supported by a marked preponderance of the evidence in the record. On January 30, 1956 the bargaining situation was that the company stood on its January 18th offer even though the local membership had voted on January 24th to reject it; a substantially similar contract, however, had been accepted by the local and signed by the union at the company's St. Mary's plant.[4] The union, on the other hand, insisted that it would not and could not accept an increase of less than 15 cents an hour.[5] This made a strike a possibility after February 6th and, as is not controverted, a sudden strike which took all employees promptly off the plant's premises could have been disastrous.

But a strike was not the only means by which the parties could be moved from their positions. The union's bargaining representatives had agreed to resubmit the company's proposal to the local membership; it could be anticipated that resistance of the party which lost this vote would soften. No one could justifiably have thought the possibilities of bargaining had been more than temporarily exhausted. There was nothing pointing to the union wanting to strike; indications were consistently to the contrary. The union had offered as early as January 9th to extend the expiring contract until April. When on January 30th the com-

pany representatives asserted that the critical elements of the plant must be closed down if the strike security afforded by a signed contract were not available, the union orally suggested a ninety day extension of the old contract with assurance that there would be no strike. The offer and assurances were put in writing by a letter the next day.

Though the company could legitimately choose to be intransigent, thereby creating a risk of momentary change in the union attitude, it was aware both from past experience and from the discussion on January 30th that by union rules there had to be a meeting of the local for the taking of a strike vote with three days notice of such a meeting. There had been neither vote nor notices. Furthermore, the company had little or no reason to doubt the effectiveness of the assurances given by the union negotiators. It had dealt with Russell in his capacity as president of the local for eight years and as a member of the bargaining committee for even longer. It had no reason to believe that he did not exert considerable influence with his fellow union members. Prorok, the representative of the international union, had also demonstrated by his actions in the 1954 Pennzoil wild-cat strike that both he and the union he represented were dependable.[6]

Further evidence that the union was responsible and reasonable accrued from

---

3. From § 10(e) of the National Labor Relations Act, 29 U.S.C.A. § 160(e). See, in interpretation thereof, Universal Camera Corp. v. N.L.R.B., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, and N.L.R.B. v. Universal Camera Corp., 2d Cir., 1951, 190 F.2d 429; Jaffe, Judicial Review: "Substantial Evidence on the Whole Record", 64 Harv.L.R. 1233 (1951). And also Gray v. Powell, 1941, 314 U.S. 402, 413, 62 S.Ct. 326, 86 L. Ed. 301; Sperry Gyroscope Co. v. N.L. R.B., 2 Cir., 1942, 129 F.2d 922.

4. The St. Mary's representative of the international consequently very nearly lost his job for committing the union to a contract which afforded less than the minimum 15 cents an hour increase sought by it. Of course this was not

known to Quaker State during the Emlenton bargaining proceedings.

5. The union felt that the 15 cents an hour increase granted by Standard Oil to its Bayway refinery workers set the pattern for the industry.

6. Parks, the plant manager, in rejecting the representations of the union negotiators that there would be no strike, had referred to the Pennzoil strike. Prorok explained that the strike was not authorized by the union and was one in which the union had fully cooperated with the affected company to protect property and settle the grievance. It was obvious that even a no-strike clause in an existing contract would not of itself prevent such a strike.

its history as bargaining representative for the company's employees. Never in those thirteen years had there been a sudden strike unauthorized by union procedures. And always when the union had desired to have available the right to strike suddenly, the company had been on prior notice by the strike vote and the preceding amenities. In other years the union, even when refusing to give 72 hours notice of the timing of the strike on top of such notice had guaranteed a safe and orderly shut-down. During the bargaining proceedings from which this dispute developed the company never even bothered to ask for that sort of guarantee. When sudden strikes had been resorted to in the past either at Quaker plants or those of its competitors the union had always co-operated in the shut-down of the critical units. Such co-operation was in the self-interest of the employees who were, by the nature of their jobs, safety conscious.

In assessing the substantiality of the evidence we have been at pains to consider only those matters relevant to the company decision to shut-down as it was formulated up to February 3rd when the shut-down began; to apply hindsight in the light of what later occurred would not be a true assessment of the company's motives. Yet the actual events later transpiring also tend to bolster the Board's finding of fact.

The local membership on February 4th voted to accept the company offer of a 9 cents an hour increase. This placed the union negotiators in the uncomfortable position of having to choose between the local's mandate and the international's expressed policy, since they were without authority to bind the international to anything less than a 15 cents an hour increase. The difficulty was presented to the international, which in mid-February refused, as was its prerogative under the union constitution, to approve the contract and recommended continuation of negotiations. In the meantime and thereafter sentiment developed among some of the members of the local for pressuring their bargaining representa-

tives into signing the contract; this was aided and abetted to some extent by the company's president, who at first indicated he would re-activate the closed-down units if he were furnished a copy of the minutes of the vote accepting the company's offer. After the minutes were transmitted to him he claimed, at first, that he would require signatures of a majority of the employees, and later, of practically all the employees to a petition indicating acceptance of the contract in order to re-activate the plant without fear of a strike. The plant manager meanwhile took somewhat inconsistent positions in the renewed bargaining sessions to the effect that the company already had a contract but would need a signed contract as strike security before going back to full-time operation. All this time it was plainer than it had ever been before the February 4th vote that the rank and file were not minded to strike and that there could be no sound fear concerning plant safety if the plant were kept in full operation.

The state of the record makes it obligatory upon us to affirm the Labor Board's finding of facts.

■ So we arrive at the area of petitioner's partial economic lockout. But, as we see it, even if the vital element of continuing bargaining negotiations was not here present, this is not off somewhere by itself—an isolated area. It must be dealt with as an integral part of the particular existing labor management situation. It is for this reason that there can be no flat, all inclusive pronouncement that an economic lockout is either forbidden or allowed under the Labor Management Act of 1947, 29 U.S. C.A. § 141 et seq.

The Board based its decision on the following principles: " * * * that, absent special circumstances, an employer may not during bargaining negotiations either threaten to lock out or lock out his employees in aid of his bargaining position. Such conduct the Board has held presumptively infringes upon the collective bargaining rights of employees in violation of Section 8(a) (1)

and the lockout with its consequent lay-off, amounts to discrimination within the meaning of Section 8(a) (3). In addition, the Board has held that such conduct subjects the Union and the employees they represent to unwarranted and illegal pressure and creates an atmosphere in which the free opportunity for negotiation contemplated by Section 8(a) (5) does not exist."

It then held: "Applying these principles to the present case, we find that the Respondent did not have reasonable grounds for believing that the Union would call a sudden strike to the detriment of the Respondent's vital operating units, and that by threatening to curtail and actually curtailing its operations with the consequent reduction in the employees' work week, the Respondent coerced employees in the exercise of their bargaining rights in violation of Section 8(a) (1) of the Act and discriminated against them within the meaning of Section 8(a) (3) of the Act. We further find that such conduct was the antithesis of good faith bargaining contemplated by Section 8(a) (5)."

Petitioner places great emphasis on the lack of an express barring of notice to take strike or lockout action by Section 8(d) (4) though it does directly prohibit strikes or lockouts during negotiations themselves. It urges that since a lawful strike does not justify refusal to negotiate, the same sort of reasoning should apply to an economic lockout during negotiations. It asserts that there is no longer an employer advantage in bargaining power rather that "Now a large and powerful union possesses more bargaining power than most, if not all, of the separate employers with whom it deals."

Whatever confusion may have existed on the subject has, we think, now been eliminated by the Supreme Court in National Labor Relations Board v. Truck Drivers Union, 1957, 353 U.S. 87, 77 S. Ct. 643, 646, 1 L.Ed.2d 676. There, we are firmly advised by the Court through Mr. Justice Brennan that under the Taft-Hartley Act " * * * there are circumstances in which employers may lawfully resort to the lockout as an economic weapon."[7] The opinion cites instances and then decides the actual narrow issue before it. The Court said generally, "Although the Act protects the right of the employees to strike in support of their demands, this protection is not so absolute as to deny self-help by employers when legitimate interests of employees and employers collide. * * * The ultimate problem is the balancing of the conflicting legitimate interests. The function of striking that balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review."

As to the particular problem in the Truck Drivers litigation the Court said in 353 U.S. at page 97, 77 S.Ct. at page 648:

"The Court of Appeals [2 Cir., 231 F.2d 110] recognized that the National Labor Relations Board has legitimately balanced conflicting interests by permitting lockouts where economic hardship was shown. The court erred, however, in too narrowly confining the exercise of Board discretion to the cases of economic hardship. We hold that in the circumstances of this case the Board correctly balanced the conflicting interests in deciding that a temporary lockout to preserve the multi-employer bargaining basis from the disintegration threatened by the Union's strike action was lawful."

What the Labor Board did in this matter was to obey conscientiously the Supreme Court directive. Following the

---

7. See also Insurance Agents' Int. Union v. N.L.R.B., 104 U.S.App.D.C. 218, 260 F.2d 736, certiorari granted 358 U.S. 944, 79 S.Ct. 352, 3 L.Ed.2d 351; American Brake Shoe Co. v. N.L.R.B., 7 Cir., 1957, 244 F.2d 489; Leonard (Davis Furniture Co.) v. N.L.R.B., 9 Cir., 1952, 197 F.2d 435, 438–442; 9 Cir., 1953, 205 F.2d 355; Morand Bros. Beverage Co. v. N.L.R.B., 7 Cir., 1951, 190 F.2d 576.

settled doctrine that the Act permits a lockout in some circumstances, it closely and competently examined the facts. It found that on January 30, 1956 both sides were still negotiating in good faith; that there was no strike; that there was written assurance of no threat of strike; that there was a restatement of a previous offer to extend the bargaining agreement for a ninety day period "while negotiations for a mutually agreeable contract are concluded"; that it was directly thereafter that petitioner closed down its plant.

In the special circumstances confronting it the Board considered that petitioner had used its lockout as an offensive weapon to better its bargaining position and as a result had distorted the bargaining process to a degree where it obtained an unfair bargaining advantage. The lockout before us, in the view of the Board, had unquestionably lessened, if it had not destroyed entirely, future strike impact. Interference with, impeding or diminishing in any way the right to strike is affirmatively forbidden by Section 13 of the Act. 29 U.S.C.A. § 163.

Petitioner argues that the element of continuance of negotiations amounts to nothing as an employer could deliberately assume an inflexible position at the negotiations, bring them to an impasse and thus clear away the objection to his calling a lockout while negotiations were proceeding. The immediate answer to that is, should a break off in bargaining be found by the Board to be a contrived thing by an employer, the resultant lockout would hardly obtain its approval.

The Board suggests that, in addition, an employer has other means to protect his status against the employees' single maneuver, i. e. a strike. For example, the employer can fill the places of the strikers [8] and he can, on his own initiative, institute the changes in employment terms he had urged in good faith at the unsuccessful negotiations.[9]

■ Whether we would agree with the reasoning of the Board or not is unimportant. What is all important is the fact that the Board has courageously and ably recognized its responsibility in this extremely sensitive field. It has fully realized that each shut-down case must be decided on its own facts. We think that it has properly performed its difficult assigned task. We are satisfied that it acted according to law in balancing the conflicting interests and deciding that the economic lockout in this instance was unjustified and in violation of the Act. We refuse to disturb what we think has been the exercise of a wise discretion by the Board.

■ There remains for disposal, the Board's conclusion that petitioner further violated Section 8(a) (5) and (1) of the Act by attempting to circumvent the union and deal directly with the employees.

While we referred to this collaterally in our preliminary statement, of necessity we must examine in some detail the evidence in support of the Board's conclusion. It appears that the petitioner, commencing on February 8, 1959, attempted to obtain a working arrangement direct with the local union and bypass the Oil Workers International Union, the bargaining agent. On that date it sent a letter to its employees describing its version of the actions of the International's representatives. On February 10th, petitioner's president gave to D. S. Konkle, Sr., a company employee, a prepared motion to read at a special employees' meeting. The motion proposed that a copy of the resolution of February 4th, accepting the new contract be signed by the secretary and sent to Hunter, the president of petitioner. As an alternative, in the event that plan failed, Hunter also gave Konkle petitions to be signed by sixty to seventy per cent of the employees, accepting a new contract as outlined in petitioner's letter

---

8. N.L.R.B. v. Mackay Radio & Telegraph Co., 1938, 304 U.S. 333, 345, 58 S.Ct. 904, 82 L.Ed. 1381.

9. N.L.R.B. v. Crompton-Highland Mills, Inc., 1949, 337 U.S. 217, 69 S.Ct. 960, 93 L.Ed. 1320.

of February 2nd, to the employees. The personnel supervisor, Newton, also prepared an instruction sheet for Konkle outlining the various steps he was to take. Konkle did attend the meeting and advised it that Hunter would reopen the plant if he were given a certified copy of the minutes which showed that the employees had accepted the company proposal. This was done but Hunter said the minutes were not adequate as they merely reflected the tally. He told Dotterer, another employee, that if he could get nearly one hundred per cent of the employees to sign the petitions this would be acceptable. Dotterer said this was impossible.

Petitioner had no further direct dealings with the employees until March 12th when it sent a letter to the employees offering them a higher wage increase than it had previously named in its negotiations with the union. It urged the employees to sign a contract without the permission of their bargaining representative, the International.

The company characterizes its conduct as trying to help the employees who signed the petitions to get the contract signed. It excuses its letter by saying that it endeavored to have the employees first try to have the International Union sign the agreement and if they could not accomplish this, to have the local union officials sign it.

There is sufficient in the proofs to substantiate the charge. It is clearly the duty of the employer under Section 8(a) (5), (1) of the Act to bargain collectively with the chosen representative of the employees exclusively. Medo Photo Supply Corp. v. N. L. R. B., 1944, 321 U.S. 678, 683–684, 64 S.Ct. 830, 88 L.Ed. 1007. The Board considered the company's representations that its only purpose was to dispose of the wage dispute and thus avoid any reason to strike. It refused to accept them because, since the employees had not repudiated their representative, differences with the latter must be handled intraunion not through the employer. While the relationship of the local union with its bargaining representative was not satisfactory, the company had no right to interfere with it as it did. In so doing it violated the Act.

The Board may submit a proposed decree for the enforcement of its order.