**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**DALTON BRICK & TILE CORPORATION, Respondent.**

No. 18765.

United States Court of Appeals
Fifth Circuit.

April 13, 1962.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Melvin J. Welles, Atty., Stuart Rothman, Gen. Counsel, Richard J. Scupi, Atty., N.L.R.B., Washington, D. C., for petitioner.

Erle Phillips, John Bacheller, Jr., Fisher & Phillips, Atlanta, Ga., for respondent.

Before TUTTLE, Chief Judge, and CAMERON and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The question presented here is whether, during the time bargaining for a collective bargaining contract is going on, an Employer may engage in a lockout as an economic weapon to enhance the acceptance of its, rather than the Union's, proposed terms. The Board held it could not. We disagree and deny enforcement of the Order.

The Board, adopting fully the report of the Examiner as its own, held that the Employer by the lockout interfered with § 7 rights (including the right to strike) of the employees [1] thus committing a § 8(a) (1) unfair labor practice,[2] discriminatorily encouraged or discouraged Union membership in violation of § 8(a) (3),[3] and failed to bargain in good faith, thus violating § 8(a) (5) [4] of the Act.

Apart from these sweeping fact-legal conclusions and similar underlying ones of like import, the subsidiary facts are either virtually undisputed or sufficient to support the version credited by the Board. Hence our differences are essentially ones of the correct applicable legal principles and the legal significance of the facts or some of the fact findings. This approach considerably simplifies the summary of the situation.

The Employer is a manufacturer of bricks in Dalton, Georgia. Because of outmoded equipment, its president characterizes the plant as marginal. Despite marked deficiences, it has to compete with large, modern and efficient plants in two nearby metropolitan centers. At the time of the lockout, the business was at

---

1. § 7, 29 U.S.C.A. § 157. "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection * * *."

2. § 8(a) (1), 29 U.S.C.A. § 158(a) (1). "(a) It shall be an unfair labor practice for an employer—
"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 of this title;"

3. § 8(a) (3), 29 U.S.C.A. § 158(a) (3). "(a) It shall be an unfair labor practice for an employer—
"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: * * *."

4. § 8(a) (5), 29 U.S.C.A. § 158(a) (5). "(a) It shall be an unfair labor practice for an employer—
"(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title."

See also § 8(d), 29 U.S.C.A. § 158(d). "For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession: * * *."

a low ebb. It had a substantial overdraft at the bank, an inventory of about 1½ million unsold bricks, current liabilities of nearly $50,000 and accounts receivable of $31,000.

It was not, therefore, in shipshape to weather any extended or severe storm. Part of this was not altogether unexpected. Weather is an important factor since it bears directly on the ability of builders to use bricks. Because of this, there was a slack season from about November to the first of March. Consequently, the paid vacation generally came as a one or two-week Christmas furlough in December, although in some recent years the men had worked and had received the furlough pay in addition to regular wages. During this slack season, the plant produced brick for inventory against probable orders in the spring. As a general impression we understand that with common brick no longer a major item of production it once was, this plant's principal business came from specific construction projects in which orders were placed long in advance for later manufacture and delivery, but at specified fixed bid prices. In view of this, a collective bargaining contract being negotiated currently could markedly affect costs and especially if a settlement of any prolonged labor dispute called for retroactive increases.

But in this relative unprosperity the Employer enjoyed cordial and apparently quite happy labor relations with its employees and the Union [5] whose actions over the years reflected both a conscious awareness of the economic plight of the company and a willingness to forego improvement in wages or working conditions which might add crippling burdens to the business. There had been no strikes or strike threats for a number of years, and only two isolated, and Union repudiated, wildcat momentary work stoppages. It was also usual for the renewal contract to be consummated long after the expiration of the current term.

In other words, there was usually a period of quite some length in which—whatever the legal rights of each might have been for "No Contract, No Work"—the parties nevertheless continued normal operations during bargaining.

The contract was to expire November 30, 1958. Within the time permitted the Union gave the 60-day notice of intention to change the terms. The first meeting was held December 5, 1958. The Union's demands included a wage raise of 12¢ per hour amounting to a 10 to 12% increase, premium pay for Saturday and Sunday work and all in excess of 8 hours, increased group health and life insurance benefits and changes in technical workloads. Stressing its precarious financial position and inability to increase costs, the Employer urged the Union to renew the contract without change.[6] The implication of this and related discussions about attempting to continue the plant in full operation was, so the Board held, that "rejection of the [Union's] proposal would be met by a suspension of operations and a consequent loss of earnings by employees."

The next meeting was December 22, 1958. In the meantime, the usual 5 days' notice if the plant were to be shut down for a Christmas vacation furlough was not given. The indication was, therefore, that the plant would operate for all save Christmas Day. Just shortly before the meeting of December 22 commenced, the Manager laid off the crew then working. The Board did not, nor could it, find that this was the beginning of a lockout. Its sole significance was to afford a background for the conversations pointing to the Employer's purposes. To inquiries whether they would return to work after the meeting, the Manager stated, or implied, that agreement to renew the old contract would mean work for all save for Christmas Day.

At the meeting the Employer countered with a renewal of the existing contract

---

5. The United Stone and Allied Products Workers of America, AFL-CIO, Local 113.

6. The Union had acceded to similar requests as to the two preceding contracts.

plus certain improvements in insurance benefits and a reduction in specified workloads. The Union responded by a willingness to settle for a 5¢, rather than a 12¢, increase. Management rejected this as financially impossible. After a caucus of the employees during a recess, the Union countered with an offer to settle on the Employer's proposal plus only the Union's overtime demands. The Employer, again stressing financial conditions, declined. At the Employer's urging, this meeting was then adjourned to permit an immediate vote by the employees. An overwhelming majority of the employees—Union and nonunion alike—voted to reject the Employer's proposal. To the rhetorical inquiry made by the Employer's representative, "Where do we go from here?", the Union's negotiator replied that if further concessions could not be made, then " * * * it appears to me that we are deadlocked and we should call in the Federal Mediation and Conciliation and see if they can start negotiations to moving."

Shortly after the meeting adjourned, the Employer's plant manager laid off all of its hourly paid production and maintenance employees except one retained for shutdown and watchman purposes. This shutdown, and statements made by management, justified an inference by the employees that the plant was closed because agreement had not been reached and, more important, that the plant would reopen when and as a new contract was made.

At the Employer's request, the next meeting was held January 5, 1959. Neither party yielded in its demands. A few days later, the Employer's representative, convinced presumably from informal discussion with employees that the men were anxious to accept the Employer's terms and return to work, sought to obtain a vote by them. It was fully recognized that Union consent to such a vote would be required. Such a meeting was held January 12 with the Union negotiator giving his express permission for the vote. Again a large majority of the employees voted for rejection. This, in the words of the Employer's Manager,

was interpreted to mean that "it doesn't look like the men want to go back to work as they said they did."

The next meeting was held in Atlanta with a Conciliator at the Federal Mediation and Conciliation Service office and a follow-up meeting was held two days later, February 8, without a conciliator present. At this meeting the parties, unaided by any outside mediator, reached agreement on all terms of a 3-year contract save the expiration date. The Union won substantial advantages including an ultimate 10¢ hourly (nearly 10%) increase, premium pay for Sunday plus the increases previously proposed by the Employer. The story ends, and perhaps the legal problem begins, with this description by the Board. "The very next day—February 24, 1959—the [Employer] resumed operations, recalling all its laid off employees to work, although the contract was not actually ratified by the employees and signed until some days later."

The Board specifically rejected the five reasons urged by the Employer as the basis of its plant shutdown: (1) the financial condition, unrelated to contract negotiations, compelled it; (2) continued production during negotiations exposed the Company to unpredictable, but retroactive, cost increases; (3) it avoided likely embarrassment with customers from possible circulation of talk in the trade concerning its union troubles; (4) it was a defensive counter measure to possible future strikes if negotiations were prolonged into or near the busy spring season; and (5) a bargaining impasse had been reached prior to the lockout. It then made the crucial, affirmative finding that the shutdown was for the primary purpose of enhancing the Employer's bargaining position and the ultimate acceptance of its terms by the Union.

We accept the finding in the main. But in so doing, the Board's affirmative finding cannot be divorced entirely from these four overpowering economic factors which, without a doubt, had so much to do with the Employer's decision that these conditions made it essen-

tial from its business point of view to obtain a bargaining power through a shutdown of operations.

Running through the Board's decision, and expressed in a variety of ways, is the notion that to "lay off (lockout) employees, or otherwise to reduce their earnings because they have * * * " made a " * * * demand through their union representative in * * * bargaining negotiations * * * " and have sought " * * * to press for, better contract terms than those offered by their employers" is a "restraint upon the exercise" of § 7 rights and "hence constitutes, at the very least, a *prima facie* violation of section 8(a) (1) * * *." And then, either assuming the answer to the matter in dispute or shifting the burden onto the Employer, or both, the Board turns that prima facie violation into "an unquestionable one where no basis appears for the lockout other than a coercive purpose to force, while negotiations are still in progress, abandonment of the Union's demands and acceptance instead of the contract terms proposed by the Employer." [7]

■ While, for reasons we discuss at length, we think it unwise to generalize in absolutes or cast the decision in doctrinaire terms of "No Contract, No Work," we think it clear that the statutes do not support any such "prima facie" or "presumptive" invalidity to the lockout when resorted to during bargaining negotiations. If illegal, its illegality must be established under specific sections such as 8(a) (1), 8(a) (3), 8(a) (5), or the like.

■ To begin with, the Act does not outlaw the lockout. In many places and in many ways, the Act places specific limitations on its use thereby implying that at least in *some* other situations it is permissible.[8] "Although, * * * there is" the Court stated, "no express provision in the law either prohibiting or authorizing the lockout, the Act does not make the lockout unlawful per se. Legislative history of the Wagner Act, 49 Stat. 449, indicates that there was no intent to prohibit strikes or lockouts as such. The unqualified use of the term 'lock-out' in several sections of the Taft-Hartley Act is statutory recognition that there are circumstances in which employers may lawfully resort to the lockout as an economic weapon. This conclusion is supported by the legislative history of the Act." N. L. R. B. v. Truck Drivers Local Union, 1957, 353 U.S. 87, 92–93, 77 S.Ct. 643, 1 L.Ed.2d 676 (footnotes omitted).

■ What—and all that—makes it illegal in circumstances not covered by specific statutory restrictions (see note 8, supra) is that its use in such a situation amounts to a breach of other specific provisions of the Act. Thus, the lockout, just as would a dismissal, a threat, coercive interrogation having the purpose of obstruction to, or interference with, union organization efforts, preference of one union over another, subverting or undermining the effectiveness of a union as a collective bargaining representative, constitutes a violation of the Act for which the employer is subject to corrective orders of the Board.[9]

■ On the other side, many cases by the Board and Courts of Appeals, in a

7. Later the Report states: " * * * the Board views lockouts in the context of contract negotiations as presumptively violative of the Act, * * * [But] that * * * special circumstances * * * may be such as to compel the employee rights to give way to * * * paramount rights of the employer. * * * The Board has made it plain that an employer may not lock out * * * his employees in aid of his bargaining position, absent special circumstances clearly justifying the need for * * * the

lockout as a defensive measure to protect his business, property or other property interests from loss or damage * * *." Elsewhere the Report makes reference to "special circumstances" and "the economic hardship rule."

8. See, e. g., 29 U.S.C.A. §§ 158(d) (4), 173 (c), 176, 178.

9. N. L. R. B. v. Somerset Shoe Co., 1 Cir., 1940, 111 F.2d 681; N. L. R. B. v. Somerset Classics, Inc., 2 Cir., 1952, 193 F.2d 613, cert. den., 344 U.S. 816, 73

variety of situations during bargaining, have affirmed the use of a lockout as a legitimate weapon to protect an employer from what is broadly described as economic hardship.[10]

So far the decision in these cases has not finally turned on the express accept-ance or rejection of the contention, urged in conceptual terms, that the lockout is the employer's corollary right to the union's right to strike. The Supreme Court has reserved decision on this.[11] The Seventh Circuit, at least, has categorically declared its acceptance,[12] while

S.Ct. 10, 97 L.Ed. 635; N. L. R. B. v. Wallick, 3 Cir., 1952, 198 F.2d 477; N. L. R. B. v. Norma Mining Corp., 4 Cir., 1953, 206 F.2d 38; Olin Industries, Inc., etc. v. N. L. R. B., 5 Cir., 1951, 191 F.2d 613, reh. den., 5 Cir., 192 F.2d 799, cert. den. 343 U.S. 919, 72 S.Ct. 676, 96 L. Ed. 1332; N. L. R. B. v. Mall Tool Co., 7 Cir., 1941, 119 F.2d 700; N. L. R. B. v. National Motor Bearing Co., 9 Cir., 1939, 105 F.2d 652; N. L. R. B. v. Cape County Milling Co., 8 Cir., 1944, 140 F. 2d 543, 152 A.L.R. 144; N. L. R. B. v. Stremel, 10 Cir., 1944, 141 F.2d 317; N. L. R. B. v. Electric Vacuum Cleaner Co., 1942, 315 U.S. 685, 62 S.Ct. 846, 86 L.Ed. 1120, reh. den., 316 U.S. 708, 62 S.Ct. 1038, 86 L.Ed. 1775; N. L. R. B. v. Cowell Portland Cement Co., 9 Cir., 1945, 148 F.2d 237, cert. den., 326 U.S. 735, 66 S.Ct. 44, 90 L.Ed. 438; N. L. R. B. v. Lund, 8 Cir., 1939, 103 F.2d 815.

See also the Annotation on "Employers' Lockout of Employees as Unfair Labor Practice under § 8(a) (1) and (3) of amended National Labor Relations Act," 1 L.Ed.2d 2022.

10. In multi-employer bargaining units, the lockout has been held lawful as an effective device to thwart union "whipsawing" tactics and to preserve the integrity of multi-employer bargaining: N. L. R. B. v. Truck Drivers Local Union, 1957, 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676; N. L. R. B. v. Spalding Avery Lumber Co., 8 Cir., 1955, 220 F.2d 673; N. L. R. B. v. Continental Baking Co., 8 Cir., 1955, 221 F.2d 427; Leonard v. N. L. R. B., 9 Cir., 1953, 205 F.2d 355; Morand Bros. Beverage Co. v. N. L. R. B., 7 Cir., 1951, 190 F.2d 576, and after remand to the Board, 7 Cir., 1953, 204 F.2d 529; Leonard v. N. L. R. B., 9 Cir., 1952, 197 F.2d 435, and after remand to the Board, 9 Cir., 1953, 205 F.2d 355.

Economic conditions unrelated to negotiations may justify a shutdown of operations or a specified portion of operations. N. L. R. B. v. Houston Chronicle Publishing Co., 5 Cir., 1954, 211 F.2d 848; N. L. R. B. v. Goodyear Footwear Corp., 7 Cir., 1951, 186 F.2d 913.

A shutdown may also be used in the midst, and because, of labor negotiations where necessary to safeguard against un-usual economic hardships or operative conditions. Betts Cadillac Olds, Inc., 96 NLRB; International Shoe Co., 93 NLRB No. 907; Duluth Bottling Association, 48 NLRB 1335. This may include situations where the Union refuses, after request, to give a no strike assurance during further bargaining. American Brake Shoe Co. v. N. L. R. B., 7 Cir., 1957, 244 F.2d 489.

A lockout is permissible when a bargaining impasse is reached. Morand Bros. Beverage Co. v. N. L. R. B., 7 Cir., 1951, 190 F.2d 576, and after remand to the Board, 7 Cir., 1953, 204 F.2d 529.

The development of this approach by the Board and Courts in many of these cases is discussed in Koretz, Legality of the Lockout, 4 Syracuse L.Rev. 251 (1953), and Koretz, The Lockout Revisited, 7 Syracuse L.Rev. 263 (1956).

11. See 353 U.S. 87, 93, 77 S.Ct. 643, note 19. "We thus find it unnecessary to pass upon the question whether, as a general proposition, the employer lockout is the corollary of the employees' statutory right to strike." N. L. R. B. v. Truck Drivers Local Union, 1957, 353 U.S. 87, 93, 77 S.Ct. 643, 1 L.Ed.2d 676.

In the trilogy of arbitration cases, it was indicated that the corollary of the no strike clause is the agreement to arbitrate. United Steelworkers of America v. American Manufacturing Co., 1960, 363 U.S. 564, 567, 80 S.Ct. 1343, 4 L.Ed. 2d 1403; United Steelworkers of America v. Warrior & Gulf Navigation Co., 1960, 363 U.S. 574, 578, 80 S.Ct. 1347, 4 L.Ed.2d 1409; United Steelworkers of America v. Enterprise Wheel & Car Corp., 1960, 363 U.S. 593, 599, 80 S.Ct. 1358, 4 L.Ed.2d 1424.

12. After stating that other employers in a multi-employer bargaining unit had a right to counter the strike's effectiveness against one employer by locking out their salesmen, the Court declared: "We so hold, not merely on the basis of the implied recognition, in the 1947 Amendment to the Act, Section 8(d) (4), of the existence of such a right, but because the lockout should be recognized for what it actualy is, i. e., the employer's means of exerting economic pressure on the un-

the action of the Third and Tenth Circuits implies, at least, a rejection of it.[13]

■■ As for us, we doubt that it is profitable to cast it either in such terms or in the parallel aphorism "No Contract, No Work." To speak in absolutes is just the beginning, since it is now clear that any such "right," like the "right" to strike,[14] favored as it is, is conditioned.[15] Rather it is our view that each case must be carefully measured by its own setting. But in that process our approach is certainly not one in which the employer starts with a presumptive burden of illegality which must somehow be overcome. Nor is the so-called employer justification limited to those factors which might be described as economic hardship.[16]

■■ Our approach is to match the employer's conduct under review against specific provisions of the Act to see whether, within the accepted limits of judicial review,[17] there is substantial evidence of actions which constitute violations of standards prescribed by Congress. We stress the latter because several recent decisions emphasize the necessity that a statutory basis, either expressed or reasonably implied, be found when the Board undertakes to fashion policies which, in its judgment, are desirable in balancing the conflicting interests between management and labor. Notable of these are N. L. R. B. v. Insurance Agents' International Union, 1960, 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454, concerning the duty to bargain in good faith, and Local 357, International Brotherhood of Teamsters, etc. v. N. L. R. B., 1961, 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed. 2d 11, dealing with hiring halls as an instrument encouraging membership in a union.[18]

■ When this is done in this record, we find no basis for the Board's conclusion that the lockout as a weapon to aid the Employer in the bargaining constituted a § 8(a) (5) failure to bargain in good faith. There is simply no evidence that the Employer, either in its general approach or in specific activity during the extended bargaining process, ever engaged in conduct variously described as "shadow boxing to a draw," "surface bargaining," "giving the Union a runaround while purporting to be meeting with the Union for purpose of collective bargaining," or other descriptives ap-

---

ion, a corollary of the union's right to strike." Morand Bros. Beverage Co. v. N. L. R. B., 7 Cir., 1951, 190 F.2d 576 at 582. On return of the case after remand to the Board, the Court adhered expressly to this doctrine, 7 Cir., 204 F. 2d 529, 531, but then enforced the Board's order because the layoffs amounted to a permanent discharge, not a temporary interruption in work.

13. Quaker State Oil Refining Corp. v. N. L. R. B., 3 Cir., 1959, 270 F.2d 40, cert. den., 361 U.S. 917, 80 S.Ct. 261, 4 L.Ed. 2d 185; Utah Plumbing and Heating Contractors Ass'n v. N. L. R. B., 10 Cir., 1961, 294 F.2d 165.

14. See, e. g., N. L. R. B. v. Fansteel Metallurgical Corp., 1939, 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599; N. L. R. B. v. Local Union No. 1229, International Brotherhood of Electrical Workers, 1953, 346 U.S. 464, 74 S.Ct. 172, 98 L.Ed. 195; N. L. R. B. v. Insurance Agents' International Union, 1960, 361 U.S. 477, 492–495, 80 S.Ct. 419, 4 L.Ed.2d 454.

15. See note 9, supra, and related text.

16. The Supreme Court has held as much: "The Court of Appeals recognized that the * * * Board has legitimately balanced conflicting interests by permitting lockouts where economic hardship was shown. The court erred, however, in too narrowly confining the exercise of Board discretion to the cases of economic hardship." N. L. R. B. v. Truck Drivers Local Union, 1957, 353 U.S. 87, 97, 77 S. Ct. 643, 1 L.Ed.2d 676 (footnotes omitted).

17. See Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

18. See also the related cases decided the same day: N. L. R. B. v. News Syndicate Co., Inc., 1961, 365 U.S. 695, 81 S. Ct. 849, 6 L.Ed.2d 29; International Typographical Union, AFL–CIO v. N. L. R. B., 1961, 365 U.S. 705, 81 S.Ct. 855, 6 L.Ed.2d 36; Local 60, United Brotherhood of Carpenters and Joiners of America, AFL–CIO v. N. L. R. B., 1961, 365 U.S. 651, 81 S.Ct. 875, 6 L.Ed.2d 1.

plicable to one making a mere formal pretense of bargaining. N. L. R. B. v. Herman Sausage Co., 5 Cir., 1960, 275 F.2d 229, 232. There was no peremptory demand by the Employer that the Union submit on a "take it, or leave it" basis. Acceptance of a particular agreement was not demanded. Rather, it was a requirement that *some* agreement be reached before returning to work. The Employer met and negotiated carefully and frequently. After the lockout of December 22, it requested the next session held January 5, and the efforts between then and the meeting of January 12 were likewise aimed at resolving the controversy. The request for, and the Union's approval of, the special vote on January 12, while unusual and perhaps unorthodox, constituted bargaining of a very real kind. One can readily conclude that it was this continued demonstration of employee-Union solidarity that was finally a powerful "argument" as bargaining continued. The next meeting, held February 6, at the Conciliator's office, reflected a continued willingness to meet and discuss and, impliedly at least, a conviction that an outside mediator would be of help. Whether this optimistic hope was articulated is not revealed, but it bore fruit by the amicable settlement reached two days later on February 8 without the aid of the Conciliator. When this settlement left the parties still at odds on the expiration date, it was mutually agreed that this aspect would be settled by the lawyers. While the delay from February 8 to 23 may seem long for a single item, there is nothing to indicate that the delay was deliberate or perverse, or for that matter anything other than the frequent difficulty of getting two lawyers together, first to confer, and finally to agree.

By all standards—deportment of the negotiators, the non-acrimonious atmosphere of the disagreements, the frequency of the sessions, and the successful achievement by the employees of substantial advantages over former proposals—this was the very essence of bargaining almost in an idyllic state.

That there were "outside" and divergent pressures perhaps at work on Union, or Employer, or both—the lockout and its consequent loss of current pay to the employees, the ominous unpredictable likelihood of interruption of business from a strike later on during the busy season to the Employer—does not infect the bargaining. So long as the parties seriously and earnestly go forward in a genuine desire to work out a final settlement of their controversies, they have complied with that mandate of the Act. The Insurance Agents' case makes clear that it is not for the Board to balance the scales, equalize or neutralize pressures under the guise of a lack of good faith attributed to the party resorting to forces of a kind the Board thinks undesirable. Indeed, we consider that case far-reaching by its concentrated focus on the immediate process of bargaining. The decision—if it does not impliedly do so completely—comes close to holding what the concurring opinion makes explicit, that it is inaccurate to regard any given action as a *per se* refusal to bargain. More than that, the decision frankly recognizes that the objective—the collective bargaining agreement—is by the very nature of things an annealing process hammered out under the most severe and competing forces and counteracting pressures. Unless Congress has proscribed a given pressure, or unless its exertion or the manner of its exercise collides with some other specific policy of the Act, its use may not be transmuted to make what is in fact good faith at the bargaining table into something else.

The same must be said of the Board's finding of § 8(a)(3) discrimination. The reasoning of the Board seems to run something like this. When an employer locks out his employees during bargaining, their pay automatically ceases. The employees see that this is a result of advocacy by the union of de-

mands for increased wages or improvements. The union is, therefore, directly responsible for the immediate economic loss. Consequently, this discourages membership in, and support of, a union.

 The defect in this reasoning is that it assumes that the Act forbids action by an employer which either encourages or discourages union membership. It assumes also that the Act forbids actions which discriminate. But this ignores the interlocking nature of the § 8(a) (3) dual factors of (1) encouragement/discouragement of union membership and (3) discrimination. "The language of § 8(a) (3) is not ambiguous. The unfair labor practice is for an employer to encourage or discourage membership by means of discrimination. Thus this section does not outlaw all encouragement or discouragement of membership in labor organizations; only such as is accomplished by discrimination is prohibited. Nor does this section outlaw discrimination in employment as such; only such discrimination as encourages or discourages membership in a labor organization is proscribed." Radio Officers' Union, etc. v. N. L. R. B., 1954, 347 U.S. 17, 42, 43, 74 S.Ct. 323, 98 L.Ed. 455, 41 A.L.R.2d 621.

It is not enough, then, to measure this in terms of its likely effect alone. Many things encourage or discourage union membership. The motivation process has been authoritatively described. "The very existence of the union has the same influence [encourages union membership]. When a union engages in collective bargaining and obtains increased wages and improved working conditions, its prestige doubtless rises and, one may assume, more workers are drawn to it. When a union negotiates collective bargaining agreements that include arbitration clauses and supervises the functioning of those provisions so as to get equitable adjustments of grievances, union membership may also be encouraged. The truth is that the union is a service agency that probably encourages membership whenever it does its job well. But as we said in Radio Officers Union, CTU v. N. L. R. B. (U.S.), supra, the only encouragement or discouragement of union membership banned by the Act is that which is "accomplished by discrimination." Local 357, International Brotherhood of Teamsters, etc. v. N. L. R. B., 1961, 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11, 18.

What is true when the union does its job well is no less true when it does it poorly or ineffectively so that its prestige falls, not rises. What is vital is whether this results from discrimination and such discrimination had as its purpose encouraging or discouraging union membership. Thus, the Court says of § 8(a) (3), "It is the 'true purpose' or 'real motive' in hiring or firing that constitutes the test." Local 357, International Brotherhood of Teamsters, etc. v. N. L. R. B., supra, 365 U.S. 667, 675, 81 S.Ct. 835, 6 L.Ed.2d 11, 17. This is emphasized in the concurring opinion of Mr. Justice Harlan which gives "explicit articulation" to "considerations * * * doubtless implicit" in the Court's opinion written by Mr. Justice Douglas. "What in my view is wrong with the Board's position in these cases is that a mere showing of foreseeable encouragement of union status is not a sufficient basis for a finding of violation of the statute. It has long been recognized that an employer can make reasonable business decisions, unmotivated by an intent to discourage union membership or protected concerted activities, although the foreseeable effect of these decisions may be to discourage what the act protects. For example, an employer may discharge an employee because he is not performing his work adequately, whether or not the employee happens to be a union organizer. * * * Yet a Court could hardly reverse a Board finding that such firing would foreseeably tend to discourage union activity. Again, an employer can properly make the existence or amount of a year-end bonus depend upon the produc-

tivity of a unit of the plant, although this will foreseeably tend to discourage the protected activity of striking. * * * A union, too, is privileged to make decisions which are reasonably calculated to further the welfare of all the employees it represents, nonunion as well as union, even though a foreseeable result of the decision may be to encourage union membership." Local 357, International Brotherhood of Teamsters, etc. v. N. L. R. B., 365 U.S. 667, 679, 81 S.Ct. 835, 6 L.Ed.2d 11, 20.

The concurring opinion goes on to point out that if it is all determined by a foreseeable tendency to encourage or discourage union membership so that such consequence determines not only the result, but the cause, the range of action allowed to employer or union would be limited to those "possible actions which had *no* foreseeable tendency to encourage or discourage union membership * * *." (italics in the original), 365 U.S. 667, 680, 81 S.Ct. 835, 6 L.Ed.2d 11, 20.

 This means that there must be substantial evidence that the Employer was here motivated by a purpose to discourage union membership when it took the strong step of the lockout on December 22. Of course, motivation may be established by circumstantial evidence, but as we have so often held in the run-of-the-mill § 8(a) (3) discriminatory discharge cases, a violation rests upon the motive of the employer in making the discharge, not upon what it appears to have been either to the victim or to the union. N. L. R. B. v. McGahey, 5 Cir., 1956, 233 F.2d 406 at 413. And, as we discuss in greater detail as to § 8

(a) (1), the objective test as to likely consequences is to be applied against the actual setting of the parties.

 Unless the foreseeable possibility of union discouragement can supply proof of both result and cause, the record here is barren of any such illegal motivation.[19] We make clear that this conclusion is in no way induced by protestations of innocence by the Employer's representatives. We put it, rather, on the overwhelming affirmation record which shows that the Employer contemplated dealing with the Union for all production employees after the lockout just as it had done for the many years previously and just as it actually did up through February 23. The " * * * presence of union bias or hostility" the Board expressly found was " * * * an element concededly absent * * *" in this case. On the contrary everything the Employer did—calling the meeting of January 5, seeking out Union consent to the vote on January 12, and the like—up through final settlement of February 23 reflects its expectation, indeed desire, that it would deal with the Union as the bargaining agent of all.

Calling the lockout under these circumstances did not, therefore, constitute § 8(a) (3) discrimination. N. L. R. B. v. W. L. Rives Co., 5 Cir., 1961, 288 F.2d 511.

 By this same analysis we find no support for the Board's conclusion that the lockout was a § 8(a) (1) denial of § 7 rights of the employees. Of course, the conclusion is supported if it is first *assumed* that by its very nature a lockout does interfere with, restrain or coerce employees in the exercise of their

19. This calls for application of the standard so frequently followed.
"This unlawful motive 'is not lightly to be inferred. In the choice between lawful and unlawful motives, the record taken as a whole must present a substantial basis of believable evidence pointing toward the unlawful one.' N. L. R. B. v. McGahey, 5 Cir., 1956, 233 F.2d 406, 413. This record, with all of its uncertainties, does not meet the standard set forth with logical clarity in N. L. R. B. v.

Fox Mfg. Co., 5 Cir., 1956, 238 F.2d 211, 214, 215, amplifying the principles discussed in N. L. R. B. v. Coats & Clark, Inc., 5 Cir., 1956, 231 F.2d 567, 572, modifying the rule of N. L. R. B. v. Houston Chronicle Pub. Co., 5 Cir., 1954, 211 F.2d 848, 854. See also N. L. R. B. v. West Point Mfg. Co., 5 Cir., 1957, 245 F. 2d 783, 786; N. L. R. B. v. Birmingham Pub. Co., 5 Cir., 1959, 262 F.2d 2." N. L. R. B. v. Dan River Mills, Inc., 5 Cir., 1960, 274 F.2d 381, 385–386.

§ 7 rights. But if that is so, then there is no purpose or need for a hearing. All that would be required would be a charge and a complaint. But obviously, as with any other alleged violation, the Act prescribes that there be substantial evidence showing the doing of the questioned activity under circumstances which constitute a breach of the statute.

As we tried to make clear in N. L. R. B. v. W. L. Rives Co., 5 Cir., 1961, 288 F.2d 511, the requirement that the case be approached on the basis of the facts of a particular record does not bring into play a subjective standard or one akin to it. The conduct, both for *motive* and likely result is finally to be judged objectively as to what one might reasonably foresee the consequences to be. But that question is not to be determined in some theoretical, hypothetical situation of some other employer and some other union, and some other employees in some other setting. The question is whether in the *actual setting* of the *particular parties*—as found by the trier of fact or as shown by unchallengeable evidence—the conduct under review could reasonably have been looked on, or considered as, or interpreted to be an interference with some protected right. Of necessity that assaying process calls for evaluation in terms of the actual relationship existing between the particular parties, the history of labor negotiations over the past, the demonstrated attitude of each, and a host of other factors making up what some have described as the "totality of the record."

Viewed in that light we see no evidence that the Employer here meant to interfere with, retard, discourage or restrain the employees in their right to self organization and collective bargaining through this Union as their chosen representative. The Employer accepted the Union as a fact of business life. Absolutely nothing is shown indicating that by trying to make a better bargain—through the use of its economic arguments reinforced by the pressure of work stoppage—it either expected, or hoped for, the destruction or deterioration of the Union, or its claim on the employee members for faithful, loyal, vigorous adherence to it. On the contrary, as summarized briefly above, every action taken reflected an awareness of the Union as the exclusive bargaining agent, and a willingness to negotiate through it. Moreover, what one in this real situation reasonably could have inferred (as to motive and consequence) from this conduct is here spectacularly demonstrated by what was actually done. Far from undermining the Union, diminishing its effectiveness, or the adherence of the employee members to it, the Employer's work stoppage only made the Union stronger. Indeed, every vote of the employees taken at the Employer's request with the consent or aid of the Union enhanced the solidarity of the Union and its advocacy of demands in behalf of the workers. Its success in that role was proved by the advantageous terms and improvements obtained in the agreement finally reached.

Much is said about a lockout interfering with the employees "right to strike" and which, expressly recognized in § 13,[20] is assumed to be within the rights guaranteed by § 7. At the outset it seems to us the Board's reasoning is quite artificial. It runs like this: the right to strike is interfered with because, the plant being shut down, there is nothing to strike against.[21] In addition, the

20. "Nothing in this subchapter, except as specifically provided for herein, shall be construed so as either to interfere with or impede or diminish in any way the right to strike, or to affect the limitations or qualifications on that right." 29 U.S.C.A. § 163.

21. The Board finds itself likewise in a logical dilemma. It first urges that as there were no strike votes or threats of a strike, the Employer was not faced with an "economic hardship" of a kind in which lockouts have sometimes been justified (see note 10, supra). At this spot it then urges that the lockout effectually prevented the employees from calling a strike which they never intended or threatened to call.

Board urges that the purpose of § 8(a) (1) was to equalize bargaining power. Consequently, it asserts, the most potent weapon—the strike—must be assured, both as a legal "right" and as a practical opportunity to assert it.[22] It then pursues the argument by urging that a lockout is not needed to offset or neutralize the economic pressure of a strike since the Employer has other weapons. These include the right to replace economic strikers once the strike begins, or once an impasse occurs to institute its own terms unilaterally. As a climax, the Board's brief here urges that resort to a lockout in advance of such a strike—or even a threatened one—and before the employer has exhausted the other weapons available to it would be to "tip the scales in favor of the employer."

But the Act does not require that an employer refrain from tipping the scales. The Act specifies particular things which may not be done. As to those the Board, indeed, has, and must have, great latitude. But the Insurance Agents' case now makes clear that when the Board undertakes to balance the relative powers of the competing forces its authority must be found in the statute.

A lockout may, under the facts of a particular case, amount to a violation of § 8(a) (1) or of § 8(a) (3) or of § 8 (a) (5) or all three. When that is done, then the Employer has indeed "tipped the scales" and Congress has emphatically denied an employer any such advantage. But unless the facts support a conclusion of a violation, then resort to a lockout may not be made a violation simply on the ground that this gives advantage to the employer, or takes advantage away from the employees, or tips the scales one way or the other.

Enforcement denied.

22. Actually the record does not show that the opportunity to strike was taken away by the lockout. Subsequent to December 22, the plant did fill some orders from existing inventory. From time to time it called back individual workers, including several having status as union officials, to do work in connection with such shipments. There was thus a timely opportunity to bring strike pressure on the Employer.